IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 25, 2016 Session

# IN RE TAMERA W., ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT-001361-14  Gina C. Higgins, Judge**
_____

**No. W2015-02463-COA-R3-CV – Filed November 10, 2016**
_____

Mother and Father appeal from the trial court's finding that clear and convincing evidence exists to establish that the children at issue are dependent and neglected and the victims of severe abuse at both parents' hands. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which ARNOLD B. GOLDIN and BRANDON O. GIBSON, JJ., joined.

Theresa D. Childress, Memphis, Tennessee, for the appellant, Lawanda K.

Dennis J. Sossaman, Memphis, Tennessee, for the appellant, Larry K.

Elizabeth W. Fyke, Memphis, Tennessee, Guardian ad Litem.[1]

Herbert H. Slatery, III, Attorney General and Reporter;  M. Cameron Himes, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

### Background

---

[1] Attorney Fyke did not file a brief in this matter; instead, on October 24, 2016, one day prior to oral argument in this cause, Attorney Fyke filed a notice that she was joining in the brief of the Tennessee Department of Children's Services. Attorney Fyke also participated in oral argument.

On October 26, 2012, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") filed a petition to adjudicate seven children dependent and neglected: Tamera W., born in 1999, Akila E.W., born in 2001, Lajerrica S.W., born in 2002, Quentell D.W., born in 2003, Jereka S.W., born in 2005, Alaysha M.W., born in 2006, and Lariyana T.K., born in 2011.[2] The petition alleged that on October 18, 2012, DCS received a referral regarding physical abuse of Alaysha by her mother, Respondent/Appellant Lawanda K. ("Mother"). The investigation revealed that three of the children had bruises, lacerations, and red marks on their backs, legs, and buttocks. The children informed the DCS investigator that the marks were the result of a punishment the night before, in which Mother whipped each child with an extension cord, while the children's hands, mouths, and eyes were covered in duct tape. The petition alleged that the children were the victims of severe abuse by Mother. In addition, the petition alleged that Mother's husband and father of three of the children, Respondent/Appellant Larry K. ("Father"), also committed severe abuse by knowingly failing to protect the children.[3]

A juvenile magistrate held a preliminary hearing on the petition on October 30, 2012. Father was present for the hearing; Mother was not present for the hearing because she was incarcerated. On November 8, 2012, a juvenile magistrate entered an order containing its findings and recommendations. Therein, the juvenile magistrate noted that Mother and Father waived their right to a preliminary hearing, that DCS was "reasonable not to make efforts to maintain the children in the home," and that there was no less drastic alternative than placing the children in DCS custody. The children were therefore placed in DCS custody, and Mother and Father were granted supervised visitation. DCS was ordered to provide anger management and parenting classes to Mother and Father, which they were ordered to complete.

During the pendency of the proceedings in the juvenile court, the juvenile court entered several permanency plans concerning the children; eventually, the goal of the permanency plans was changed from return to parent to adoption.

In the meantime, on September 13, 2013, a juvenile magistrate held a hearing on DCS's dependency and neglect petition. The juvenile magistrate issued a written ruling finding that the petition be sustained, that the children be found dependent and neglected, and that the children were the victims of severe abuse. Given the allegations of physical abuse, the magistrate further found that it was reasonable for DCS not to make efforts toward reunification. The magistrate's findings and recommendations were adopted, ratified, and confirmed as the order of the juvenile court on the same day as the hearing.

---

[2] This Court has a policy of protecting the identity of children in dependency and neglect cases by initializing their last names and those of their parents.

[3] Father is the biological parent of Quentell, Alaysha, and Lariyana. The biological fathers of the other children are not at issue in this appeal.

A written order was thereafter entered sustaining the dependency and neglect petition on November 5, 2013.

Mother and Father filed petitions for rehearing before the juvenile court judge. A hearing was held on March 10, 2014, Substitute Judge Dan H. Michael presiding. The juvenile court entered an order on March 24, 2014: (1) dismissing Father's petition for re-hearing because he did not appear for court; (2) allowing Mother's request for rehearing; and (3) again sustaining DCS's dependency and neglect petition. In its order, the juvenile court found clear and convincing evidence that the children were dependent and neglected based upon the children's interviews with DCS investigator Tanisha Harper. According to the juvenile court, each of the children separately recounted similar allegations of physical abuse at the hands of Mother. The juvenile court therefore found that Mother had perpetrated severe abuse against four of the children, Alaysha, Quentell, Jereka, and Lajerrica. As a result of what the juvenile court deemed to be the "torture" of the children, the juvenile court ordered that the children remain in DCS custody, that DCS was relieved of making reasonable efforts toward reunification of the family, and that Mother and Father would have no contact of any kind with the children.

Mother and Father thereafter timely appealed to the Shelby County Circuit Court ("trial court"). The trial court heard the de novo appeal on March 10, March 11, and July 8, 2015. Ms. Harper testified about her interviews with Alaysha, Quentell, Jereka, Lajerrica, Tamera, and Akila. The interviews took place first individually and then as a group. During these interviews, several of the children stated that they were whipped on October 17, 2012, or had been in the past. According to the children, Mother would make the children squat with their faces against the wall and hands above their heads, sometimes holding this position for hours while holding books over their head, lead the children one by one into her bedroom, make them remove their clothes, duct tape their mouth, wrist, and eyes, and then proceed to whip them. The children explained that Mother initially used a belt for this "discipline" but that she had switched to an extension cord because the belt was not painful enough. One child explained that Mother made abuse an "everyday" occurrence and that if one child got in trouble, Mother would whip all of them. Other forms of punishment included making six children split a can of carrots and removing their beds so that they would have to sleep on the cold floor. Ms. Harper took photographs of the injuries to Alaysha, Quentell, Jereka, and Lajerrica, which showed extensive bruising, red marks, scratches, and lacerations. For example, a photograph of Alaysha's back showed two red marks consistent with the size of an electrical cord covering nearly the length of her back. Likewise, photographs of Quentell showed multiple lacerations and scratches on his backside and legs. According to Ms. Harper, while not all of the children had fresh marks of abuse, some exhibited older marks suggesting that they had been "whipped . . . with extension cords in the past."

The children informed Ms. Harper that Father was aware of the abuse by Mother because he was in the home when the abuse occurred. Father would also sometimes

participate in the discipline, but the children indicated that he only ever used a belt, never an extension cord. The children stated that sometimes during Mother's "discipline" of the children, Father would leave the house to go out to his car and smoke. According to the children, Father once told Mother that she should not whip the children in such a manner but that Mother responded that she could discipline the children as she saw fit.

Ms. Harper finally testified that the family had been the center of eight prior DCS investigations, the majority of which concerned allegations of physical abuse. At one point, the children were placed into foster care for a year while Mother was required to attend counseling. According to Ms. Harper, as a result of these investigations, Mother was informed as to what DCS considered appropriate discipline of the children, and Mother indicated to DCS that she was aware of what discipline was appropriate. Ms. Harper finally testified that based upon the injuries to the children, in the estimation of DCS, Mother's actions in whipping the children in this case constituted severe abuse and neglect. Other than Lariyana, the children were also called into court to give their statements concerning the abuse and their desired outcomes for the case.[4]

DCS social worker Letina Pruitt testified about her interactions with the family after the children were removed from Mother's custody. According to Ms. Pruitt, while the children still have some emotional and behavioral issues, they have generally improved since their removal from Mother's and Father's custody. Ms. Pruitt testified that several of the children are medicated for attention deficit and other disorders. In addition, Ms. Pruitt testified that Quentell was required to be hospitalized for mental health issues for a period of time but that he appears to improving now that he is medicated. Ms. Pruitt stated that Mother had initially complied with the permanency plans put in place by the juvenile court but that Mother refused to comply after the goal of the permanency plans was changed to adoption. Ms. Pruitt admitted, however, that Mother had completed a mental health assessment and an anger management program, as required by the permanency plans.

Mother admitted to whipping the children with a belt and making them squat in the hallway as a form of punishment. Still, Mother denied ever using an extension cord or duct tape on the children, as well as forcing the children to sleep on the floor or denying them food. Mother contended that the children lied about the abuse because they are manipulative and have a history of lying and stealing. Mother admitted, however, that it was her "discipline" that caused the marks depicted in the photographs taken by Ms. Harper in October 2012. According to Mother, she was required to discipline the children

---

[4] The children, however, were not sworn in as witnesses. This Court has repeatedly held, however, that statements made in open court are not evidence unless given by a witness who has taken an oath or affirmation before testifying. *See, e.g.*, **Dayhoff v. Cathey**, No. W2011-02498-COA-R3-JV, 2012 WL 5378090, at *3 (Tenn. Ct. App. Nov. 1, 2012); **In re D.M.H.**, No. W2006-00270-COA-R3-JV, 2006 WL 3216306, at *7 (Tenn. Ct. App. Nov. 8, 2006). The rule is equally applicable to both children and adults who testify. Accordingly, we will not consider the children's statements in this case.

due to their many behavior problems. Despite this contention, Mother denied that any of the children required medication because the "children never displayed that type of behavior at home." Instead, Mother contended that the children's behavioral issues after being taken into DCS custody resulted solely from their need to return to her care. Mother admitted, however, that the "discipline" she administered to the children in October 2012 was not appropriate and testified that she would no longer physically discipline the children should they be returned to her home. According to Mother, she had learned to discipline the children in other ways, such as removing video game privileges. As a result of the alleged abuse, Mother testified that she pleaded guilty to four counts of aggravated child assault, for which she had received judicial diversion.[5]

Mother also stated her belief that she had substantially complied with the requirements under the various permanency plans put in place by the juvenile court, including the completion of psychological evaluations on May 17, 2013, and May 1, 2015, with Dr. Kenneth Jones, a licensed clinical psychologist. Both Dr. Jones's deposition and the reports from the psychological evaluations were submitted into evidence. According to the 2013 evaluation report, Mother has a tendency to repress or deny problems. As such, the report noted that should DCS determine that reunification was possible, Dr. Jones strongly recommended ongoing family therapy, individual treatment, and medication. The report finally noted that Mother's issues "make it very difficult for her to act efficiently as a mother of minor children." When Mother was reevaluated in 2015, however, Mother indicated that she was not pursuing any individual counseling. In addition, Dr. Jones noted "noticeable inconsistencies" between Mother's reports of her participation in services and the reports from DCS and Mother's former clinical therapist. Accordingly, Dr. Jones made the following recommendations:

1. Given the severity of the allegations, including significant physical and emotional abuse of the minor children, and the apparent disconnect between the comments of the family service worker's notes compared to those of [Mother's] clinical therapist, it is strongly recommended that additional investigation of the historical accuracy of the provided information be determined prior to the reunifying of the family unit.

2. Based on [Mother's] report of her lack of psychological therapy in the wake of the allegations, and a reported non-involvement in accountability or counseling that could be producing improvement in [Mother's] overall ability to deal with stress appropriately, and develop effective communication and parenting skills, it is strongly recommended that individual counseling commence and continue immediately. It is also recommended that, when [Mother's]

---

[5] At oral argument, counsel for Mother indicated that she was still on probation under the judicial diversion.

counselor deems her ready, family counseling sessions begin prior to reunification, so that communication and effective problem solving skills can be learned, practiced, and established.

Finally, in accordance with his evaluation of Father, discussed in detail *infra*, Dr. Jones recommended that the children not be returned to the home so long as Father is present until Father had completed six months of successful treatment.

Father contended that he only saw Mother discipline the children by making them squat and that he never whipped them. Father also testified he never saw Mother discipline the children because she would take them into a room and he would usually be outside. According to Father, he was diagnosed with bipolar disorder and schizophrenia in 2008. At the time of trial, Father revealed that he had not taken his medication as prescribed for several days and that he did not complete parenting classes or a mental health assessment because he did not understand why he had to do those things.

Like Mother, Father completed a psychological evaluation with Dr. Jones, on May 8, 2015, and the report from the psychological evaluation was submitted into evidence. During the evaluation, Father admitted that after he was allegedly diagnosed with bipolar disorder and schizophrenia, he failed to take his prescribed medication or obtain required follow-up treatment. In his report, Dr. Jones opined that Father's past diagnoses were possibly inaccurate because Father was malingering or exaggerating his symptoms. As such, Dr. Jones recommended that Father be re-evaluated. Dr. Jones did find, however, that Father's intellectual functioning was in the borderline range but that he could "fully comprehend and understand" the purpose of the psychological evaluation. In his deposition, Dr. Jones testified that when asked about the physical abuse of the children, Father indicated that "he never felt like the need to intervene was there." Instead, Father would "disengage[e]" or "leave the house." Based upon the totality of the evidence, Dr. Jones recommended that the children not be returned to Father until he had successfully participated in a treatment plan and parenting training for a period of six months.

On November 9, 2015, the trial court granted the petition to adjudicate all of the children dependent and neglected. The trial court also found that four of the children, Alaysha, Quentell, Jereka, and Lajerrica, were the victims of severe abuse at both Mother's and Father's hands.

### Issues Presented

Mother raises two issues, which are taken and slightly restated, from Mother's appellate brief:

1. Whether the court in the dependency and neglect case erred by not allowing the children to visit or reunite with Mother through therapy and reasonable efforts.
2. Whether the juvenile court erred by ignoring Mother's substantial compliance with the permanency plan.

In addition, Mother questions the appropriate standard for appellate review in this case. In contrast, Father raises only one issue; whether the trial court erred in finding clear and convincing evidence that his children were dependent and neglected.

**Analysis**

As recently explained by the Tennessee Supreme Court:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Here, both parents argue that the trial court erred in its finding of dependency and neglect and severe abuse as to the children at issue. The Tennessee General Assembly has described by statute what constitutes dependency and neglect, the procedures and steps to be taken in making this determination, and the jurisdiction of the juvenile courts. As is relevant to the instant appeal, a "dependent and neglected child" is a child:

(F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;

(G) Who is suffering from abuse or neglect; . . . .

Tenn. Code Ann. § 37-1-102(b)(12) (outlining other definitions not at issue in this case). In turn, "abuse" is defined as:

[A] person under the age of eighteen (18) [who] is suffering from, has sustained, or may be in immediate danger of suffering from or sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker[.]

*Id.* § 37-1-102(b)(1). On the other hand, "severe child abuse" is defined, in relevant part, as:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

(ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).[6]

*Id.* § 37-1-102(b)(22) (outlining other definitions not at issue in this case).

The General Assembly has vested juvenile courts with "exclusive original jurisdiction" to hear allegations that a child is dependent and neglected as defined above. *Id.* § 37-1-103(a)(1). The statutes governing dependent and neglect proceedings require, in effect, a two-step analysis. First, under Tennessee Code Annotated section 37-1-129, the juvenile court is required to hold a hearing and to make findings as to whether a child is dependent and neglected. If the juvenile court finds the child to be dependent and neglected, by clear and convincing evidence, then "a dispositional hearing shall be held." *Id.* § 37-1-129(b)(2). In making a disposition, the court must determine the disposition "best suited to the protection and physical, mental and moral welfare of the child." *Id.* § 37-1-130(a). These dispositions can include remaining in the home or removal from the home in appropriate circumstances. *See State v. Adams*, 24 S.W.3d 289, 296 (Tenn. 2000) (quoting Tenn. Code Ann. § 37-1-130(a)) (noting that "juvenile courts are vested

---

[6] Section 39-15-402(d) defines "serious bodily injury" as including, but not limited to "second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects."

- 8 -

with the power to transfer temporary custody of depend[e]nt and neglected children to other persons for the 'protection and physical, mental and moral welfare of the child'"); *Doe v. Norris*, 751 S.W.2d 834, 836 (Tenn. 1988) (citing T.C.A. § 37-1-130(a)) ("The [juvenile] court may allow the child to remain with his parents . . . under court supervision; or, . . ., the court may remove the child from his parents . . . and place the child temporarily in the custody of the State Department of Human Services or any other agency authorized by law to care for the child.").

# I.

Mother first argues that because of the implications of the trial court's finding of dependency and neglect and severe abuse, "the review of the Dependency and Neglect case should be viewed under the same appellate standard as a [t]ermination of [p]arental [r]ight [case]." We are somewhat perplexed by Mother's argument. Under Title 37, Chapter 1, as it existed at the time of the trial in this cause, DCS was required to prove both the fact that a child is dependent and neglected and the fact that a parent has engaged in severe child abuse by clear and convincing evidence. Tenn. Code Ann. § 37-1-129(c) (2015) ("If the court finds from clear and convincing evidence that the child is dependent, neglected or unruly, the court shall proceed immediately or at a postponed hearing to make a proper disposition of the case.");[7] *Tenn. Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005), *perm. app. denied* (Tenn. Aug. 29, 2005) (holding that, despite the lack of a statutory requirement that severe child abuse be shown by clear and convincing evidence, the clear and convincing standard must be applied due to the consequences of such a finding). This is the same standard that is applicable with regard to the required elements in a termination of parental rights proceedings. *See* Tenn. Code Ann. § 36-1-113 (c) (requiring clear and convincing evidence of a ground for termination); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) ("To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest.").

---

[7] In July 2016, Tennessee Code Annotated section 37-1-129 was amended by the Tennessee General Assembly. *See* 2016 Tenn. Laws Pub. Ch. 600 (S.B. 2574), eff. July 1, 2016. Among the changes to the statute, the language of section 37-1-129 requiring a finding of dependency and neglect be supported by clear and convincing evidence was removed. *See id.* Neither party in this case argues: (1) that the new version of the statute abrogates the long-held principle that dependency and neglect findings be supported by clear and convincing evidence; or (2) that the new version of the statute should apply in this case. Indeed, from our review, it appears that this Court has continued to apply the earlier version of the statute in cases decided after the amendment but which were initiated and tried prior to the amendment. *See, e.g.*, *In re: M.D.*, No. M2015-01023-COA-R-3-JV, 2016 WL 5723954, at *3 (Tenn. Ct. App. Sept. 30, 2016) (applying the earlier version of the statute despite the fact that the case was decided after the amendment); *In re Damian M.*, No. E2015-02353-COA-R3-JV, 2016 WL 5928981, at *2 (Tenn. Ct. App. Sept. 30, 2016) (same); *In re Samuel D.*, No. E2015-01449-COA-R3-JV, 2016 WL 5210706, at *3 (Tenn. Ct. App. Sept. 19, 2016) (same). Accordingly, we likewise apply the earlier version of section 37-1-129 in this case.

In addition, we review the trial court's ultimate findings of dependency and neglect or severe child abuse de novo with no presumption of correctness. *See In re Damian M.*, No. E2015-02353-COA-R3-JV, 2016 WL 5928981, at \*2 (Tenn. Ct. App. Sept. 30, 2016). Similarly, the question of whether a ground for termination has been established or whether termination is in a child's best interest is likewise reviewed de novo with no presumption of correctness. *See In re Adoption of A.M.H.*, 215 S .W.3d 793, 810 (Tenn. 2007) (holding, in a termination of parental rights case, that "[a]s a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground of willful abandonment are reviewed de novo with no presumption of correctness"). Accordingly, there appears to be little distinction between either the quantum of proof required under the version of the statute implicated in this case or the appropriate standard for this Court's review, regardless of whether the issue is dependency and neglect and severe abuse or termination of parental rights.

Further elucidation of the standard at issue in this case, however, may be helpful. We begin first with the quantum of evidence required to meet the clear and convincing standard. For the evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007). "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable' than not." *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

In dependency and neglect cases, the General Assembly has directed that any appeal from the juvenile court is to be heard by the circuit court. The appeal from juvenile court to circuit court in a dependency and neglect case is not the same as this Court's review of trial court decisions as set out in the Tennessee Rules of Appellate Procedure. That is because, by statute, the circuit court is to "hear the testimony of witnesses and try the case de novo." Tenn. Code Ann. § 37-1-159(a). A de novo trial is "[a] new trial on the entire case—that is, on both questions of fact and issues of law—conducted as if there had been no trial in the first instance." *Kissick v. Kallaher*, No. W2004-02983-COA-R3-CV, 2006 WL 1350999, at \*3 (Tenn. Ct. App. May 18, 2006). Consequently, the circuit court is not "reviewing" the juvenile court's decision; instead, it is conducting a new proceeding as though the petition was originally filed in circuit court.

As previously discussed, whether the ultimate issues of dependency and neglect or severe child abuse have been established by clear and convincing evidence are questions of law, which we review de novo with no presumption of correctness. *See In re S.J.*, 387 S.W.3d 576, 588 (Tenn. Ct. App. 2012) (quoting *In re Samaria S.*, 347 S.W.3d 188, 200

(Tenn. Ct. App. 2011)) ("Whether the combined weight of the facts, either as found by the trial court or supported by a preponderance of the evidence, establish clearly and convincingly that the parent committed severe child abuse is a question of law, subject to de novo review with no presumption of correctness."). This Court reviews the trial court's findings of fact de novo on the record accompanied by a presumption of correctness, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). If some of the trial court's factual findings are based on its determinations of the credibility of the witnesses, then this Court will afford great weight to those credibility determinations and will not reverse such determinations absent clear evidence to the contrary. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995).

To the extent the trial court made findings of fact in support of the ultimate issues, we review the factual findings pursuant to Tennessee Rule of Appellate Procedure 13(d), i.e., de novo with a presumption of correctness unless the evidence preponderates otherwise. *In re A.T.P.*, No. M2006-02697-COA-R3-JV, 2008 WL 115538, at * 4 (Tenn. Ct. App. Jan. 10, 2008) (holding that findings of fact in a dependency and neglect action for severe child abuse are "presumed to be correct unless the evidence preponderates against them"); *see also In re Adoption of A.M.H.*, 215 S.W.3d at 808–09. However, the trial court's conclusions of law concerning the ultimate issues are reviewed de novo without a presumption of correctness. *S. Constructors, Inc. v. Loudon Cnty. Board of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Therefore, this Court will review the trial court's specific findings of fact in support of its ultimate conclusions de novo, pursuant to Tennessee Rule of Appellate Procedure 13(d), with a presumption of correctness; however, we will review those conclusions of law, i.e., that the parents engaged in severe child abuse and that the children are dependent and neglected, de novo with no presumption of correctness.

Mother also appears to argue that in order to find the children dependent and neglected and the victims of severe abuse, DCS was required to prove by clear and convincing evidence a ground for termination of her parental rights under Tennessee Code Annotated section 36-1-113(g), and that termination is in the children's best interests. Respectfully, we cannot agree. First, we note that nothing in the definition of a dependent and neglected child requires that a ground for termination of Mother's parental rights has been established by appropriate proof. *See generally* Tenn. Code Ann. § 37-1-102(b)(12). The same is true of the definition of severe abuse. *See generally id.* § 37-1-102(b)(22). Indeed, Mother cites no cases, nor has our research revealed any, in which Tennessee courts have held that a ground for termination or a best interest determination must be made in order to adjudicate a child dependent and neglected or the victim of severe abuse. *See In re Jimmy B.*, No. E2015-02070-COA-R3-PT, 2016 WL 2859180, at *6 (Tenn. Ct. App. May 11, 2016) (noting that the dependency and neglect proceeding and termination of parental rights proceeding are "separate proceeding[s]").

By the same token, Mother's argument that the trial court erred by ignoring Mother's substantial compliance with the permanency plan is also unavailing. Again, nothing in either the definition of a dependent and neglected child or severe abuse requires that the trial court determine whether the parent has complied with an applicable permanency plan. Mother also cites no law to support her proposition that the trial court's failure to make such a finding is fatal to the trial court's findings of dependency and neglect and severe abuse. While Mother's substantial compliance with the applicable permanency plans may be relevant in a termination of parental rights proceeding, *see* Tenn. Code Ann. § 36-1-113(i) (outlining the factors the court should consider in determining whether termination is in a child's best interest, which, among other things, includes whether the parent has made "lasting adjustment after reasonable efforts by available social services agencies"), this fact alone does not prevent the trial court from finding the children dependent and neglected or to be the victims of severe abuse.

**II.**

Father argues that his children were not dependent and neglected. We note that although Mother asserts that the trial court erred "in the dependency and neglect case" by not allowing visitation, Mother does not argue that the children were not dependent and neglected. As this Court has previously held, however, a finding of dependency and neglect is not particular to one parent or the other but simply questions the status of the children. *See **In re Daymien T.***, No. E2015-02527-COA-R3-PT, 2016 WL 4060267, at *1 (Tenn. Ct. App. July 27, 2016), *perm. app. denied* (Tenn. 2016) ("Nothing in these provisions specifically requires that a dependency and neglect finding must be made against or 'as regards' to a specific parent."). As such, despite Mother's failure to brief this argument, we will consider whether the trial court correctly found clear and convincing evidence that all of the children were dependent and neglected.

Here, the trial court specifically found that the children were dependent and neglected in that they were in a "condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others" and that they had suffered from or were in immediate danger of suffering from "a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent[.]" *See* Tenn. Code Ann. § 37-1-102(b)(1), (12)(F). From our review of the record, the evidence does not preponderate against the trial court's finding that all of the children were dependent and neglected. The record contains substantial evidence that all of the children were the victims of excessive discipline. This abuse included beating the children with an extension cord, making the children squat for hours, forcing the children to sleep on the floor despite the fact that a bed was available, duct-taping the children's hands, feet, mouths, and eyes, and feeding six children only one can of vegetables. Although Mother and Father denied the abuse, the children all generally recounted the same types of abuse to the DCS worker. Additionally, at the time the children were taken into custody, four of the children, Alaysha, Quentell, Jereka, and

- 12 -

Lajerrica, had visible wounds on their backs, legs, and buttocks, from the "discipline" that they received. Although the remaining children interviewed by Ms. Harper did not have open wounds, Mr. Harper testified that the bruises and healing wounds still lingering on their bodies nevertheless indicated evidence of prior abuse. Furthermore, Mother admitted that the discipline she administered to the children in October 2012 was not appropriate. The record also shows that, in addition to this case, the family had been the center of eight prior DCS investigations, most of which concerned allegations of physical abuse. From our research, trial courts have often found that the use of excessive discipline consistent with this case was sufficient to find children dependent and neglected. *In re Carrington H.*, 483 S.W.3d 507, 514 (Tenn. 2016), *cert. denied sub nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, No. 15-1317, 2016 WL 1675831 (U.S. Oct. 3, 2016) (involving a termination of parental rights case that stemmed from a dependency and neglect finding based, in part, on inappropriate discipline); *In re Kyah H.*, No. E2015-00806-COA-R3-PT, 2015 WL 9426285, at *6 (Tenn. Ct. App. Dec. 23, 2015) (involving a termination of parental rights case that stemmed from a dependency and neglect finding based on inappropriate discipline where father threw a child to the ground and sat on another child after pushing him down); *In re Angelica S.*, No. E2011-00517-COA-R3-PT, 2011 WL 4553233, at *2 (Tenn. Ct. App. Oct. 4, 2011) (involving step-mother's stipulation that the inappropriate discipline constituted abuse for dependency and neglect purposes); *In re J.C.W.*, No. M2007-02433-COA-R3-PT, 2008 WL 4414675, at *1 (Tenn. Ct. App. Sept. 26, 2008) (involving a termination of parental rights case that stemmed from a dependency and neglect finding based on inappropriate discipline, where the child was beaten with a belt); *In re B.L.*, No. M2003-01877-COA-R3-PT, 2004 WL 2451355, at *4 (Tenn. Ct. App. Nov. 1, 2004) (involving a termination of parental rights case that stemmed from a dependency and neglect finding based on inappropriate discipline). From the totality of the circumstances, we cannot conclude that the evidence preponderates against the trial court's finding that clear and convincing evidence was established by DCS to show that the children are dependent and neglected.

**III.**

We note that despite the fact that the trial court found that both Mother and Father had perpetuated severe abuse on four of the children, neither party raises the trial court's severe abuse finding in their statements of the issues. This Court has repeatedly held that the failure to designate an argument as an issue in the party's appellate brief results in a waiver of the argument on appeal. *See, e.g.*, *Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) (citing *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002)) ("We may consider an issue waived where it is argued in the brief but not designated as an issue."). Father does argue, however, in the body of his brief that the trial court erred in finding that he knowingly exposed the children to abuse or knowingly failed to protect the children from abuse pursuant to Tennessee Code Annotated section 37-1-102(b)(22). In contrast, nothing in Mother's brief can be fairly characterized as an argument that the trial court erred in finding that she perpetrated severe abuse on four of

the children. Issues are waived where the appellate brief does not contain "any argument regarding its merits." ***Bean v. Bean***, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000) (citing ***Blair v. Badenhope***, 940 S.W.2d 575, 576–77 (Tenn. Ct. App. 1996); ***Bank of Crockett v. Cullipher***, 752 S.W.2d 84, 86 (Tenn. Ct. App. 1988)). Accordingly, it appears that both Mother and Father have waived any argument that the trial court erred in finding clear and convincing evidence that they perpetrated severe abuse on the children.

Recently, the Tennessee Supreme Court in ***In re Carrington H.***, held that, "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." ***In re Carrington H.***, 483 S.W.3d at 525–26. The ***Carrington*** decision did not concern an appeal from a dependency and neglect proceeding. No Tennessee Court has ever held that this Court must consider whether the trial court erred in finding clear and convincing evidence of severe abuse in an appeal from a dependency and neglect proceeding in spite of the parents' failure to properly brief the issue. Indeed, as discussed above, the ***Carrington*** holding is specifically limited to "an appeal from an order terminating parental rights." ***Id.*** Accordingly, we do not interpret the ***Carrington*** Opinion as requiring review of the severe abuse finding at issue in this case.

Regardless, in an abundance of caution, we have reviewed the record to determine whether the evidence preponderates against the trial court's finding of severe abuse as to both parents with regard to LaJerrica, Quentell, Jereka, and Alaysha. Here, the evidence shows that the children came into custody when Alaysha complained to her teacher about being "whipped by her mother." An investigation revealed that the backsides of Alaysha, Quentell, Jereka, and Lajerrica displayed red marks, lacerations, bruises, and scratches. There was no dispute that Mother perpetrated these injuries on the children; Mother contended, however, that the marks were the result of appropriate discipline with a belt rather than an extension cord as claimed by the children. As previously discussed, severe abuse may be found where a parent has knowingly exposed a child or knowingly failed to protect a child from abuse that is likely to cause severe bodily injury. Tenn. Code Ann. § 37-1-102(b)(22). Serious bodily injury may include "injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." ***Id.*** § 39-15-402(d). Clearly, the bruising, lacerations, and other marks on the children caused by whipping, regardless of whether the instrument used was a belt or an extension cord, constitute serious bodily injury as defined by the Tennessee General Assembly. There is no dispute that Mother caused these injuries to the children. Indeed, Mother admitted that she pleaded guilty to four counts of aggravated assault in connection with the injuries she perpetrated on the children. As such, we cannot conclude that the evidence preponderates against the trial court's finding that Mother committed severe abuse against Alaysha, Quentell, Jereka, and Lajerrica.

Father does not dispute that the children suffered a serious bodily injury that required their removal from the home. Instead, he argues that the trial court erred in finding that he knowingly exposed the children to abuse or knowingly failed to protect the children from abuse given his mental illnesses and limited intellectual ability. We, respectfully, disagree. As previously discussed, under section 37-1-102(b)(22), severe abuse may be found where a parent not only "knowingly exposed" a child to abuse but also where a parent "knowingly failed to protect" a child from such abuse. *See In re H.L.F.*, 297 S.W.3d 223, 237 (Tenn. Ct. App. 2009) (finding that mother was also guilty of severe abuse even though there was no direct evidence that mother actively engaged in the abuse). The terms "knowing" or "knowingly" are not defined in Tennessee Code Annotated section 37-1-102 or elsewhere in the chapter. This Court has previously held that: "The words 'knowing' and 'knowingly' do not have fixed or uniform meanings. Their meanings vary depending on the context in which they are used or the character of the conduct at issue." *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at \*7 (Tenn. Ct. App. July 13, 2004). Therefore, "[a] parent who is present when a child is abused but who fails to intervene to protect the child has knowingly exposed the child to, or has failed to protect the child from, abuse." *H.L.F.*, 297 S.W.3d at 236. The parent, however, need not actually be present when the abuse occurs:

> A parent's failure to protect a child will also be considered "knowing" if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur.

*Id.* (quoting *R.C.P.*, 2004 WL 1567122, at \*7). A parent therefore knowingly fails to protect a child when he or she "has actual knowledge of the relevant facts and circumstances or when . . . [he or] she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to [him or] her." *Id.* (quoting *R.C.P.*, 2004 WL 1567122, at \*7).

In this case, there is ample evidence in the record that Father was present in the home during the beatings and that he did nothing to intervene on the children's behalf. First, the children reported to DCS that Father was often in the home during the beatings and that he sometimes participated in the abuse by beating the children with a belt. In addition, the children reported to DCS that Father would often leave the home when the beatings began. Finally, the children reported that Father did at least once attempt to intervene on their behalf but that Mother stated that she could "whip [her children] how [she] want[ed] to whip them." Accordingly, the evidence shows that Father was aware of the nature of the abuse occurring in the home, and he himself believed that the discipline administered was excessive but did not make a considered effort to prevent the abuse from occurring.

Father argues that, despite this fact, he could not have knowingly failed to protect the children because he "lacked the intellectual ability to have knowingly committed severe abuse." Respectfully, we disagree. Here, Father testified that he was diagnosed with bipolar disorder and schizophrenia. In his evaluation, however, Dr. Jones opined that Father's alleged diagnoses may be the result of exaggeration. Furthermore, nothing in Dr. Jones's report indicates that Father's mental issues or cognitive abilities prevented him from understanding the nature of the abuse inflicted on the children by Mother. Given the testimony regarding Father's one-time attempt to intervene on behalf of the children against Mother's excessive use of violence as discipline, we cannot conclude that Father's alleged disorders prevented him from knowing that the children were being exposed to abuse.

We do note that there can be no dispute that Father's intellectual functioning tested in the borderline range. This Court, however, has previously affirmed a finding of severe abuse against a parent despite the fact that the parent at issue was classified as having Low Average to Borderline Intellectual Functioning. *See In re Samaria S.*, 347 S.W.3d 188, 194 (Tenn. Ct. App. 2011). In this case, nothing in Dr. Jones's report or deposition indicates that Father's failure to protect the children was the result of his inability to understand the wrongfulness of the abuse. As such, we cannot conclude that the trial court erred in finding that Father knowingly failed to protect the children from abuse in spite of his borderline intellectual functioning.

## IV.

Finally, Mother argues that, having found the children dependent and neglected, the trial court erred in ordering a disposition of the children in which no visitation was permitted between Mother and the children and no effort was made toward reunification. Specifically, Mother argues that she made a concerted effort to comply with the juvenile court's permanency plans in order to facilitate reunification with her children. In addition, Mother contends that Dr. Jones opined that with extensive therapy and counseling, Mother and the children could be reunited. In light of these facts, Mother argues that the trial court erred in relieving DCS of efforts to reunify the family and in ordering a disposition of the children that did not involve visitation or efforts at reunification.

As previously discussed, pursuant to Tennessee Code Annotated section 37-1-130, where a child is found to be dependent and neglected, the trial court may make any one of several dispositions of the child "best suited to the protection and physical, mental and moral welfare of the child." Tenn. Code Ann. § 37-1-130(a). Among the available dispositions are allowing the child to remain in the home, granting temporary legal custody to a third party, granting a permanent guardianship to a third party, or placing the child in the custody of DCS. *Id.* Here, the trial court determined that based on the severe abuse committed against the children, the appropriate disposition was to place the

children in DCS custody without allowing any visitation with Mother or Father and without requiring DCS to expend any effort at reunification.

We conclude that the trial court did not err in making the above disposition. Pursuant to Tennessee Code Annotated section 37-1-166, reasonable efforts are required to be exerted prior to removal of any child into the custody of DCS. Tenn. Code Ann. § 37-1-166(a). The purpose of the reasonable efforts requirement is "to preserve and reunify families[.]" Tenn. Code Ann. § 37-1-166(g)(1). As such, section 37-1-166 requires reasonable efforts both prior to the placement of a child into foster care—"to prevent or eliminate the need for removing the child from the child's home"; and after removal of the child—"[t]o make it possible for a child to safely return to the child's home." Reasonable efforts are not required, however, where:

> The parent has subjected the child that is the subject of the petition or any sibling or half-sibling of the child who is the subject of the petition or any other child residing temporarily or permanently in the home to aggravated circumstances as defined in [section] 36-1-102; . . . .

Tenn. Code Ann. § 37-1-166(a)(g)(4)(A).

As discussed in detail above, the trial court found that Mother and Father committed severe abuse against four of the children at issue in this case. Accordingly, the trial court was authorized by section 37-1-166(g)(4)(A) to order a disposition of the child that did not include an effort toward reunification. Here, the evidence also fully supports the trial court's decision not to attempt to reunify the family; from the record, it appears that the children were subject to multiple forms of excessive and abusive discipline at the hands of their caregivers. Indeed, as previously discussed, the October 2012 incident that is the subject of this case is not the first incident involving physical abuse that warranted DCS investigation in the past. Under these circumstances, the trial court did not err in declining to order a disposition that allowed visitation or maintained the possibility of reunification.

## Conclusion

The judgment of the Circuit Court of Shelby County is affirmed, and this cause is remanded to the trial court for all further proceedings as are necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellants, Lawanda K. and Larry K., for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE