IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 1, 2025

IN RE HUNTER W.[1]

**Appeal from the Circuit Court for Shelby County**
**No. CT-0744-23      Cedrick D. Wooten, Judge**

_____

**No. W2024-00479-COA-R3-JV**

_____

The appellant appeals the circuit court's findings that her minor child is dependent and neglected and a victim of severe abuse. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Ada Johnson, Memphis, Tennessee, for the appellant, Gabrielle W.

Jonathan Skrmetti, Attorney General and Reporter, and Amber L. Barker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

Hunter W. (the "Child"), born July 2015, is the child of Gabrielle W. ("Mother") and Jeremy B. ("Father").[2]   On December 13, 2016, the Tennessee Department of Children's Services (the "Department" or "DCS") filed a petition (the "2016 Petition") in the Shelby County Juvenile Court (the "juvenile court") alleging that the Child was dependent and neglected as defined by Tennessee Code Annotated section 37-1-102(b)(13) due to nutritional neglect. The petition asked the juvenile court to enter a non-custodial permanency plan. DCS averred that it received a referral on September 8, 2016, informing the Department that the Child had previously been diagnosed with failure to thrive but that

---

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights to protect their privacy and identities.

[2] Father is not participating in this appeal and is mentioned herein only as necessary for context.

there was "no medical problem found for the failure to thrive." At the time of the referral in September 2016, the Child was approximately fourteen months old and weighed approximately seventeen to eighteen pounds. According to DCS, the parents transported the Child to LeBonheur Children's Hospital ("LBCH") on September 7, 2016, due to concerns about ongoing diarrhea, and the physician examining him stated that he was "very malnourished and small for his age." Child Protective Services Investigator ("CPSI") Jemeca Pointer visited the family at their home after receiving the referral and reported that the Child appeared malnourished – "[h]is eyes were a little sunken, his arms were skinny, his legs were skinny, and his feet had the appearance of a newborn's feet (skinny and long)." He could not walk yet, though the parents reported that he would walk if someone held his hands and walked behind him. CPSI Pointer alleged that "[i]n talking to the family, it was learned that a lot of issues were due to lack of follow-up by the parents[,]" including the parents' delaying scheduling follow-up medical appointments for the Child. CPSI Pointer "explained the seriousness of the baby losing weight" to the parents and the importance of "follow[ing] up with his doctor so that he [could] be seen on a consistent basis." CPSI Pointer submitted a referral for the Child to be evaluated by Tennessee Early Intervention Services ("TEIS"); however, TEIS closed the referral after being unable to reach either of the parents. DCS developed a non-custodial permanency plan to ensure the safety and well-being of the Child. At the time the 2016 Petition was filed, DCS believed that it was in the Child's best interest to remain in the parents' home, subject to the juvenile court's supervision, so long as the parents were complying with the "counseling, treatment, and other conditions and limitations" of the plan. The parents agreed with the plan, which required them to "cooperate with DCS and/or other service providers, specifically [TEIS]" and to do so "in an expeditious manner."

A new permanency plan was developed on September 15, 2017. This plan explains that the juvenile court placed the Child in DCS custody on September 1, 2017, due to Mother's continued noncompliance with TEIS and failure to follow up on recommendations that the Child be seen by various specialists. The plan required Mother to "complete a mental health assessment, parenting assessment, and maintain residential/ financial stability" before the Child could be returned to her custody.

On November 9, 2017, the juvenile court entered an order finding by clear and convincing evidence that the Child was dependent and neglected as defined by section 37-1-102(b)(13)(F) and (G) because he "suffered from medical neglect in the care of his mother[.]" The juvenile court found that the Child "suffered from malnourishment which required close medical follow up and services to assist the child with his developmental delays" and that Mother "did not cooperate with these follow up services and appointments." The juvenile court also found "that at least part of the reason for mom's noncompliance was her lack of understanding of her son's medical needs which continued up to the time of trial." The Child was "still not developmentally appropriate for his age" at the time of trial on September 1, 2017; however, he had made "some improvements" since the 2016 Petition was filed. The juvenile court concluded that it was contrary to the

Child's welfare to remain in Mother's custody due to her "continued inability to appropriately meet his medical needs."

On April 2, 2018, the juvenile court entered an order finding that Mother had completed all the requirements of the permanency plan, and it was in the Child's best interest to begin a ninety-day trial home visit with Mother on April 10, 2018. The order provided that legal custody of the Child would return to Mother on July 10, 2018, unless the juvenile court determined that termination of DCS's custody was not in the Child's best interest. The record does not contain any further filings related to the 2016 Petition.

On February 8, 2021, when the Child was five years old, DCS filed a second petition (the "2021 Petition") asking the juvenile court to find the Child dependent and neglected as defined by Tennessee Code Annotated section 37-1-102(b)(13) and to award custody to DCS. The Department alleged that it received a referral on December 23, 2020, reporting that the Child

> was a victim of nutritional neglect and physical abuse perpetrated by Mother and an unknown perpetrator. The referral stated that the child has a face laceration. Mother said she does not know how the incident happened. Mother said the child fell off the bed which caused him to hit his chin on the bed rail. The child expressed concerns about being pushed, and Mother was witnesse[d] shushing the child from talking. The doctor stated he took the child to the vending machine, and there the child said his aunt, Mother's sister, was the one who pushed the child out of bed causing the laceration on the child's chin. The child also disclosed being hit in the home but did not disclose who hit him.

CPSI Robin Brown met with the Child and Mother at LBCH and stated that the Child had "a laceration on his chin and other marks and bruises on his body." CPSI Brown reported that Mother said she did not know what caused such marks and bruises. DCS averred that the Child's doctor "expressed concerns that, after further testing, Hunter had a fractured back and high liver enzymes." Mother's younger two children were also present, and the doctor expressed concerns about their "size and weight."[3] DCS developed a new non-custodial permanency plan and required that all contact with the maternal aunt ("Aunt") be supervised. On January 11, 2021, a Child and Family Team Meeting was held. According to DCS, "[i]t was decided that all the children should be placed in the Department's custody to ensure that they meet milestones and thrive." The 2021 Petition references the 2016 Petition as to the Child. It also alleges that in January 2018, DCS received a referral that one of Mother's younger children "was the victim of lack of

---

[3] Mother has three children. The Department filed a separate petition asking the juvenile court to find Mother's two younger children to be dependent and neglected. These matters were consolidated for the purpose of trial; however, they are separate matters on appeal. Mother's younger two children are not at issue in this appeal and are mentioned herein only as necessary for context.

supervision and environmental neglect[]" perpetrated by Mother and that services were recommended for Mother at that time. DCS filed amended petitions on February 8 and February 24, 2021, to correct Father's name.

Medical records admitted as evidence at trial reveal that Hunter was "mildly malnourished" upon his admission to LBCH on December 23, 2020, but that he was able to gain weight prior to his discharge on December 30, 2020. A physician's progress note recorded on December 24, 2020, states in relevant part:

> Hunter is a 5 y/o male admitted for concerns of poor weight gain and a chin laceration after reportedly falling off a bed[.] A chin laceration and the bruise on his anterior chest may have been caused by a fall off a bed as previously described; however, there is no way to differentiate whether the fall off the bed was a result of his own actions or from his aunt hitting or pushing him off the bed. Nursing has continued to document concern for mother's interaction with Hunter and perceived lack of attention to his physical and psychological needs.
>
> * * *
>
> What is perhaps the most concerning is the finding of the healing vertebral fractures on CT. A child can sustain these type of fractures with forceful axial loading, hyper-extension or flexion, or blunt force trauma to the spine. Vertebral bodies are not typically injured th[]rough otherwise benign accidental injuries, and at this time there is no known mechanism of injury provided to explain these fractures.
>
> Given the totality of findings for this patient (failure to thrive, poor weight gain, chin laceration with questionable abdominal trauma, and now healing fractures of the vertebral bodies) inflicted injury remains a concern and further investigation is warranted.

Mother testified that the Child had been referred to a gastroenterologist because he would throw up every time he ate but that she had not taken him to see the gastroenterologist since the Child returned to her custody in July 2018.

Mother took the Child for a follow-up appointment at the Nutrition Clinic at LBCH on January 28, 2021. During this visit, they met with a registered dietician who noted that the Child's weight was the same as it had been at an earlier pediatrician's appointment on January 8, 2021, and that the dietician would have liked for him to have gained some weight during that period.

On February 9, 2021, the juvenile court entered an *ex parte* protective custody order finding probable cause to believe that the Child was dependent and neglected as defined by section 37-1-102(b)(13) and that he was subject to an immediate threat to his health or safety if he remained in Mother's legal custody. The juvenile court ratified a new permanency plan on March 11, 2021, which required Mother to "participate in parenting education to learn techniques for providing supportive and prod[uc]tive parenting to her children[,]" "provide employment verification to" DCS, "look for stable housing that will fit into her budget and provide verification once secured[,]" "participate in supervised visits with the child(ren) a minimum of 4 hours per month[,]" and "provide financial support [and] other needs" for the children.

On August 9, 2021, the juvenile court entered an order finding by clear and convincing evidence that the Child was dependent and neglected as defined by section 37-1-102(b)(13)(B), (F), and (G) "based on Mother leaving the child with caretakers who could not properly care for the child, the child's continued diagnosis of failure to thrive without remedy, and Mother's improper guardianship of the child which included how the child presented upon entering the Department's custody." The juvenile court also found that the Child "had healing lumbar fractures for which Mother had no explanation and food insecurity, indicating he was not regularly fed" and that witnesses testified as to his "diminished physical state[] and nutritional neglect." Additionally, the juvenile court found, by clear and convincing evidence, that the Child was severely abused as defined by section 37-1-102(b)(27)(A)(i) because Mother failed to protect him from abuse or neglect that was likely to cause serious bodily injury or death. The Child remained in DCS custody.

Mother requested a rehearing on the 2021 Petition. Following the rehearing on April 14, 2022, the juvenile court found clear and convincing evidence that the Child was dependent and neglected as defined by section 37-1-102(b)(13)(D) and (F) because

> Mother failed to provide the child with proper nutrition and feeding and failed to take the child to necessary medical appointments. Furthermore, the child's medical records showed that he had healing spinal fractures and bruises and marks for which Mother could not account. The medical records also noted that the child had a new red mark on him when he was alone with Mother at LeBonheur after the medical staff's initial assessment of the child.

> The Court found that Mother neglected the above-named child's medical needs and continues to fail to understand his needs, despite completing services meant to address these issues. Hunter W[.] had been removed from Mother's care two years prior to December 2020 for similar issues. Mother received counseling and other services, the child was returned to her, but the child maintained similar issues to those presented in 2018. The Court found that Mother took no action to remedy the issues of the child failing to gain weight, lack of proper nutrition, and Mother's lack of transportation.

Moreover, Mother stated that the child had not been seen by a doctor in two years. These issues were further highlighted by [Hunter's foster father's] testimony that the child is gaining weight, thriving, and meeting developmental milestones.

(Paragraph numbering omitted). The juvenile court again found, by clear and convincing evidence, that the Child was severely abused as defined by section 37-1-102(b)(27)(A)(i) because Mother "knowingly exposed the child to abuse that is likely to cause serious bodily injury or death" by "fail[ing] to follow up with a doctor to address Hunter's medical issues for approximately two years and [because she] could not account for the child's healing spinal fractures and other marks and bruises." Mother then appealed to the Shelby County Circuit Court (the "trial court").

The trial court held a bench trial on February 7, 2024, and entered its final order on February 23, 2024. The trial court found "clear and convincing evidence that the children are dependent and neglected in Mother's care pursuant to Tenn. Code Ann. § 37-1-102(b)(13)(C) as Mother improperly cared for the children and the children lacked proper supervision." The trial court also found "clear and convincing evidence that the child, Hunter W[.], is severely abused by Mother [pursuant] to Tenn. Code Ann. §37-1-102(b)(27)(A)(i) as Mother knowingly exposed the child or knowingly failed to protect the child from abuse or neglect that is likely to cause serious bodily injury or death." Mother appeals the trial court's final order.

### ISSUES

Mother raises three issues on appeal, which we restate slightly:

1. Whether the trial court erred in finding that the Child is dependent and neglected.

2. Whether the trial court erred in finding that the Child was a victim of severe abuse.

3. Whether the trial court made sufficient findings of fact and conclusions of law.

### STANDARD OF REVIEW

As this Court has explained,

[a] child who is suffering from abuse is a dependent and neglected child. *See* Tenn. Code Ann. § 37-1-102[(b)](1[3])(G). A determination that a child is dependent and neglected must be supported by clear and convincing evidence. *See* Tenn. Code Ann. § 37-1-129(a)(1) & (c). Severe child abuse in a dependency and neglect proceeding must also be established by clear

- 6 -

and convincing evidence. *In re S.J.*, 387 S.W.3d 576, 591 (Tenn. Ct. App. 2012).

The "clear and convincing evidence standard" is more exacting than the "preponderance of the evidence" standard, although it does not demand the certainty required by the "beyond a reasonable doubt" standard. *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000). The clear and convincing evidence standard defies precise definition. *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). Evidence satisfying this high standard produces a firm belief or conviction regarding the truth of facts sought to be established. *In re C.W.W.*, 37 S.W.3d at 474. Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992).

Our review of the trial court's determinations on questions of fact is de novo with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d).

*In Re Zaliyah S.*, No. M2019-01241-COA-R3-JV, 2020 WL 3494471, *3 (Tenn. Ct. App. June 26, 2020) (quoting *In re M.D.*, No. M2015-01023-COA-R3-JV, 2016 WL 5723954, at *3–4 (Tenn. Ct. App. Sept. 30, 2016)). "[W]e review the trial court's ultimate findings of dependency and neglect or severe child abuse de novo with no presumption of correctness." *In re Tamera W.*, 515 S.W.3d 860, 870 (Tenn. Ct. App. 2016) (citing *In re Damian M.*, No. E2015-02353-COA-R3-JV, 2016 WL 5928981, at *2 (Tenn. Ct. App. Sept. 30, 2016)).

## ANALYSIS

At the time the 2021 Petition was filed in February 2021, the definition of a dependent and neglected child under the statute included a child "[w]ho is under unlawful or improper care, supervision, custody or restraint by any person . . . ." Tenn. Code Ann. § 37-1-102(b)(13)(C) (effective July 1, 2019). The trial court found

clear and convincing evidence that the children are dependent and neglected in Mother's care pursuant to Tenn. Code Ann. § 37-1-102(b)(13)(C) as Mother improperly cared for the children and the children lacked proper supervision. Specifically, the Court heard testimony and saw proof that the children were malnourished, Hunter had unexplained spinal fractures, and the children were developmentally delayed. Mother failed in her responsibility to properly care for and supervise the children. Proof and testimony showed that while in Mother's custody, Hunter W[.] had not seen a doctor in two years and [Mother's younger children] had not seen a doctor

since birth. Mother testified that she tried to find a primary care physician for the children, but offered no proof or names of doctors she considered. Mother testified she knew her insurance provided transportation to doctor's appointments, but Mother said she could not find time to make appointments 24 hours in advance.

Mother's skeletal argument in support of her first issue is that "there were no finding[s] of facts and conclusions of law present to set out that the child was dependent and neglect[ed] while in the care of the mother. No standard was presented to determine if the Department met their burden by clear and convincing evidence." We do not agree.

Mother failed to provide the Child with the level of care needed for him to thrive, even after the Department intervened years earlier to educate Mother on the level of basic care that a child requires. Not only was the Child malnourished at the time he was injured in December 2020, but Mother's younger two children were also malnourished at that time.[4] In fact, during a parenting assessment completed in June 2021, Mother stated that the Department's concerns were valid and that she was completing the assessment to "learn[] how to maintain with 3 children." Despite this, however, she failed to timely follow through with the additional recommended parenting education following her assessment.[5]

Moreover, the record on appeal supports the trial court's finding that the Child lacked proper supervision. At the juvenile court trial on April 14, 2022, Mother testified that "Hunter told [her] that [Aunt] was hitting him constantly" and that Mother had confronted Aunt about this allegation. Despite this, Mother continued leaving the Child in the care of Aunt, including regularly having Aunt watch the Child while Mother was at work and having the Child sleep in a room with Aunt on December 23, 2020, the night his chin was injured. The trial court's factual findings are supported by the record on appeal,

---

[4] Additional medical records in evidence reveal that Mother's youngest child, G.W., was hospitalized in July 2020, when she was approximately two months old, for failure to thrive and "poor weight gain." G.W. was discharged from that hospitalization "after demonstrated days of weight gain." Approximately six months later, at a follow-up visit on January 8, 2021, seven-month-old G.W.'s weight was "relatively unchanged from hospital admission," and she was again "noted to have poor weight gain." The documenting physician also expressed concern that G.W. "has not seen a medical provider since her discharge from the hospital in July and has essentially missed her 2 month, 4 month, and 6 month well child check" and was delayed in receiving the recommended vaccines. Similarly, in January 2021, Mother's middle child, two-year-old S.S., was found by physicians to have "moderate malnutrition and poor weight gain presenting with significant abdominal distention," "relative wasting of her upper and lower extremities," "[d]elayed bone age," and "borderline macrocytic anemia likely secondary to poor nutrition and vitamin deficiency."

[5] Mother testified that she completed the parenting education the week of trial; however, she had not provided any proof of such completion to the Department.

and the combined weight of these facts clearly and convincingly establishes that the Child was without proper care and supervision.

We next turn to the trial court's severe abuse finding. The relevant statute provides:

(27) "Severe child abuse" means:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

(ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(c)[.]

Tenn. Code Ann. § 37-1-102(b)(27) (effective July 1, 2019). Section 39-15-402 provides a non-exhaustive list of injuries that constitute "serious bodily injury to the child[.]" This non-exhaustive list includes "a fracture of any bone." Tenn. Code Ann. § 39-15-402(c) (effective July 1, 2019). The trial court found

clear and convincing evidence that the child, Hunter W[.], is severely abused by Mother [pursuant] to Tenn. Code Ann. §37-1-102(b)(27)(A)(i) as Mother knowingly exposed the child or knowingly failed to protect the child from abuse or neglect that is likely to cause serious bodily injury or death. Specifically, the child was malnourished, underweight, and had spinal fractures that Mother could not explain.

Mother argues that "there was no determination that the [D]epartment proved sever[e] abuse by clear and convincing evidence." We do not agree. Mother's neglect in failing to properly care for and supervise the Child led to him being malnourished for years and suffering unexplained spinal fractures – "a fracture of any bone." *See* Tenn. Code Ann. § 39-15-402(c). The trial court expressly found clear and convincing evidence that the Child was severely abused, and the combined weight of the facts regarding the Child's failure to thrive and unexplained spinal fractures support this finding.

Finally, Mother challenges the sufficiency of the trial court's findings of fact and conclusions of law. "Rule 52.01 of the Tennessee Rules of Civil Procedure requires the trial court to state expressly its findings of fact and conclusions of law, even where the parties do not request it." *In re S.J.*, 387 S.W.3d 576, 594 n.9 (Tenn. Ct. App. 2012) (citing Tenn. R. Civ. P. 52.01). As this Court has explained:

There is no bright-line test for assessing the sufficiency of the trial court's factual findings. [*Gooding v. Gooding*, 477 S.W.3d 774, 782 (Tenn. Ct. App.

2015)]. Generally, however, "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Id*. (quoting *In re Estate of Oakley*, [No. M2014-00341-COA-R3-CV,] 2015 WL 572747, at *11 [(Tenn. Ct. App. Feb. 10, 2015)]).

*In re Houston D.*, 660 S.W.3d 704, 721 (Tenn. Ct. App. 2022).  In this case, the trial court identified the evidence it considered, the laws it applied, and its factual findings that support each of its conclusions of law.  The trial court's steps in reaching its conclusions are clear, and we conclude that the trial court's order satisfies Rule 52.01.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the Circuit Court for Shelby County.  This case is remanded to the trial court for proceedings consistent with this opinion.  Costs of this appeal are taxed to the appellant, Gabrielle W., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE