IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2020

IN RE NEHEMIAH H. ET AL.

Appeal from the Circuit Court for Fentress County
Nos. 2017-CV-79, 2017-CV-80     Elizabeth C. Asbury, Chancellor
_____

No. M2019-01167-COA-R3-JV
_____

This dependency and neglect action focuses on ten siblings: Josiah, Nehemiah, Jonathan, Hadasah, Nathaniel, Noah, Hope, Malachi, Obadiah, and Grace ("the Children"), whose ages ranged from eighteen years to one year at the time of trial.[1] All of the Children were born during the marriage of Amy H. ("Mother") and Timothy H. ("Father"). The Children were taken into the custody of the Department of Children's Services ("DCS") based on allegations of abuse and neglect by the parents. The Fentress County Juvenile Court ("juvenile court") determined that the Children were dependent and neglected, and the parents appealed that ruling to the Fentress County Circuit Court ("trial court"). Following a *de novo* trial, the trial court also determined that the Children were dependent and neglected and that the parents had committed severe child abuse. Both Mother and Father have appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which RICHARD H. DINKINS and KENNY W. ARMSTRONG, JJ., joined.

Amy R. McLaughlin, Oak Ridge, Tennessee, for the appellant, Amy H.

Laurie A. Seber, Cookeville, Tennessee, for the appellant, Timothy H.

Herbert H. Slatery, III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] Although Josiah had attained the age of eighteen years by the time of the hearing in the trial court, he was still attending high school. The trial court included Josiah in its findings concerning the abuse of the Children.

## OPINION

### I. Factual and Procedural Background

In this dependency and neglect action, the Children were taken into custody on June 14, 2017, following an order issued by the juvenile court, stating, in pertinent part:

> This cause came on to be heard on the 14th day of June, 2017 before the Honorable Todd Burnett, Judge of the Juvenile Court of Fentress County, Tennessee, for hearing of an Ex Parte Order of Protection between [Mother] and [Father] and an Ex Parte Emergency Protective Custody Order and Restraining Order regarding the minor child Josiah [].

> Upon the Court's own motion, based upon the proof presented at prior hearings between these parties which occurred on May 3rd, 2017 and May 11th, 2017, statements made by the oldest child Josiah [], and the written statements of [Mother] indicating that she wishes to dismiss the pending Order of Protection between the parties, and the entire record, from all of which the Court finds by clear and convincing evidence that the above-named children are dependent and neglected.

> The Court further finds that it [is] contrary to the children's welfare to remain in the care, custody, or control of their parents . . . ; that there is no less drastic alternative to removal; that reasonable efforts were made to prevent the children's removal from the home; or because of the emergency natures of the children's conditions or other circumstances, the lack of preventative measures was reasonable; and it is not in the children's best interest to prevent their removal . . . .[2]

According to her subsequent trial testimony, Mother had left Fentress County with the Children in May 2017 and was residing in a domestic violence shelter in Davidson County. Mother also stated that she wrote a letter seeking dismissal of the order of protection against Father because she was no longer residing in Fentress County. The trial testimony of the DCS case manager established that she had been unable to locate Mother or the Children for weeks prior to the June 14, 2017 hearing. Therefore, in its

---

[2] Although Mother's petition seeking an order of protection does not appear in the appellate record, Mother acknowledged the filing of the petition during her testimony at a hearing conducted on October 24, 2018, and she further verified the petition's contents and stated that her abuse allegations were truthful. None of the parties have disputed that such petition was filed. Furthermore, although the parties' appellate briefs state that Mother's petition for an order of protection was filed in the Fentress County General Sessions Court, that court also exercises juvenile court jurisdiction in Fentress County. *See* Tenn. Code Ann. § 37-1-203.

June 14, 2017 order, the juvenile court directed that anyone with knowledge of the Children's whereabouts should disclose that information to DCS.

Following the Children's removal, DCS filed a petition seeking to have the Children declared dependent and neglected and seeking an award of emergency temporary legal custody on August 8, 2017. In this petition, DCS alleged that it had received a referral regarding the Children on April 7, 2017, for purported domestic violence and physical abuse in the home, as well as mental health concerns, inappropriate living conditions, and a lack of appropriate supervision. DCS reported that there were also concerns of educational neglect regarding Hadasah. DCS averred that when the case manager spoke to Josiah at school, Josiah related that he was living with the maternal grandparents because his parents and all of his siblings were residing in a two-bedroom mobile home. Josiah also purportedly related that Mother had suffered a "breakdown" and had walked to his school to tell him that she was going to die. Josiah further explained that Father was violent and controlling, that he was physically abusive to certain of the Children, and that he had even locked them in closets. Josiah indicated that he did not feel safe staying at home with Father.

According to DCS's petition, Mother admitted to DCS that she had suffered a mental health breakdown that resulted in her seeking medical attention at a hospital. She also allegedly admitted that Father was "loud" and had angry outbursts. DCS additionally asserted in the petition that after filing for an order of protection, Mother testified that Father was physically abusive to the Children and her.

The juvenile court entered a protective custody order on August 8, 2017, and subsequently entered an adjudicatory hearing order on October 18, 2017, finding that clear and convincing evidence existed that the Children were dependent and neglected and had suffered severe child abuse at the hands of their parents. A dispositional hearing order was then entered on February 9, 2018, directing that the Children should remain in their current placements.

Mother appealed the juvenile court's ruling to the trial court. Following the trial court judge's recusal, Chancellor Elizabeth Asbury presided over this matter by interchange. The trial court conducted a *de novo* trial spanning three non-consecutive days in July and October 2018, during which the court heard testimony from the parties, four of the Children, and other witnesses. The trial court entered extensive findings of fact and conclusions of law on November 13, 2018, ultimately concluding that the Children were dependent and neglected.

The trial court found that all of the Children had suffered abuse and neglect pursuant to Tennessee Code Annotated § 37-1-102. The court also found that Josiah, Nehemiah, and Jonathan had been subjected to severe child abuse pursuant to Tennessee Code Annotated §§ 37-1-102(B)(22) and 39-15-402(a)(3). Moreover, Hadasah had

endured educational neglect so as to adversely affect her welfare pursuant to Tennessee Code Annotated § 39-15-401(b). The court specifically determined that the neglect and abuse suffered by the Children was at the hands of the parents. On December 31, 2018, the trial court entered an adjudicatory hearing order, incorporating its previous findings and conclusions.

On May 31, 2019, the trial court entered further findings of fact and conclusions of law following a dispositional hearing conducted over three non-consecutive days in January and April 2019. The court considered testimony from the parties and other witnesses during these hearings and again made extensive factual findings, including that neither parent had shown by clear and convincing evidence that the Children would be safe and free from further abuse in his or her home. Although the court found that Mother had demonstrated great improvement in her lifestyle and mental state since her separation from Father, the court also determined that her lack of disclosure with therapists was "troubling." Additionally, the court found that Father's failure to work with licensed counselors was a concern. The court noted that each parent blamed the other or the maternal grandfather for his or her estrangement from the Children and that neither had acknowledged his or her fault in the situation.

The trial court ultimately determined that it was in the best interest of the Children to continue their current placements, with therapeutic counseling with the parents to occur when the respective counselors recommended it. Mother was allowed to continue to have supervised visits with the two youngest children. Furthermore, the court ordered that Father would not be allowed to have therapeutic visits until he participated in counseling with a licensed counselor for a reasonable period of time and was candid about his prior conduct. Both parents timely appealed to this Court.

## II. Issues Presented

Mother presents the following issues for our review, which we have restated slightly as follows:

1. Whether the juvenile court erred by issuing a bench order removing the Children from Mother's custody and continuing such removal beyond the period of eighty-four hours.

2. Whether the trial court erred by determining the Children to be dependent and neglected.

3. Whether the trial court erred by determining that Mother had committed severe child abuse.

4.  Whether the trial court erred by failing to return custody of the Children to Mother or direct that reunification be sought by DCS.

Father has likewise raised the issue of whether the dependency and neglect adjudication was unfounded.[3]

## III.  Standard of Review

Concerning the standard of review in dependency and neglect cases involving severe child abuse, this Court has previously elucidated:

A child who is suffering from abuse is a dependent and neglected child. *See* Tenn. Code Ann. § 37-1-102(12)(G).  A determination that a child is dependent and neglected must be supported by clear and convincing evidence. *See* Tenn. Code Ann. § 37-1-129(a)(1) & (c).  Severe child abuse in a dependency and neglect proceeding must also be established by clear and convincing evidence. *In re S.J.*, 387 S.W.3d 576, 591 (Tenn. Ct. App. 2012).

The "clear and convincing evidence standard" is more exacting than the "preponderance of the evidence" standard, although it does not demand the certainty required by the "beyond a reasonable doubt" standard. *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000).  The clear and convincing evidence standard defies precise definition. *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989).  Evidence satisfying this high standard produces a firm belief or conviction regarding the truth of facts sought to be established. *In re C.W.W.*, 37 S.W.3d at 474.  Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992).

Our review of the trial court's determinations on questions of fact is *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d).  Whether a child has been proven dependent and neglected by clear and convincing evidence is a question of law which we review de novo without a presumption of

---

[3] Although Father purports to argue additional issues in the body of his appellate brief, the sole issue raised in his statement of the issues was whether the trial court's dependency and neglect finding was in error.  As such, any other issues not raised in the statement of the issues are deemed waived. *See Champion v. CLC of Dyersburg, LLC*, 359 S.W.3d 161, 163 (Tenn. Ct. App. 2011) ("An issue not raised in an appellant's statement of the issues may be considered waived.").

correctness. *In re H.L.F.*, 297 S.W.3d 223, 233 (Tenn. Ct. App. 2009). To the extent the trial court's determinations rest upon an assessment of the credibility of witnesses, the determinations will not be overturned absent clear and convincing evidence to the contrary. *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*In re M.D.*, No. M2015-01023-COA-R3-JV, 2016 WL 5723954, at *3-4 (Tenn. Ct. App. Sept. 30, 2016) (quoting *In re Kaitlynne D.*, No. M2013-00546-COA-R3-JV, 2014 WL 2168515, at *1-2 (Tenn. Ct. App. May 21, 2014)).

IV. Removal Order

Mother contends that the juvenile court erred by removing the Children from her custody via a bench order when DCS had not yet filed a petition seeking removal. Mother relies upon various statutory sections contained within Title 37 of the Tennessee Code concerning juvenile courts and proceedings, specifically, Tennessee Code Annotated § 37-1-108 (West 2017), which provides that proceedings in juvenile court may be commenced, *inter alia*, by the filing of a petition, and § 37-1-111 (2014), which establishes that venue is generally proper in the county in which the child resides or, for dependency and neglect proceedings, in the county in which the child is present when the action is commenced. As Mother points out, the Children were residing with her in Davidson County at the time of their removal.

DCS posits, and we agree, that juvenile courts have exclusive original jurisdiction over proceedings "in which a child is alleged to be delinquent, unruly or dependent and neglected . . . ." Tenn. Code Ann. § 37-1-103 (2014). We also concur with DCS's contention that courts must "look to the substance rather than to the form of the pleadings" in order to determine whether the petition filed contains allegations of dependency and neglect. *See Fletcher v. Fletcher*, No. E2001-01223-COA-R3-JV, 2002 WL 459012, at *4 (Tenn. Ct. App. Mar. 26, 2002) (determining that a "Petition for Emergency Custody" raised allegations of dependency and neglect even though the petitioners did not specifically seek such a finding); *see also J.W.G. v. T.L.H.G.*, No. M2002-02656-COA-R3-JV, 2003 WL 22794537, at * 4 (Tenn. Ct. App. Nov. 25, 2003) (treating the father's petition for custody as a dependency and neglect action based on the allegations contained therein).

In the case at bar, there is no dispute that Mother filed a petition seeking entry of an order of protection against Father based on allegations of physical abuse and domestic violence. During the circuit court trial, Mother read into the record the allegations contained in her original petition, which included statements that Father had engaged in such behaviors as "breaking things, grabbing arms, smacking children. . . . Spanking too hard sometimes. Hit me twice." Mother testified that these allegations concerning Father were true and that the Children had suffered abuse by reason of his actions. Tennessee

- 6 -

Code Annotated § 37-1-102(b)(13) (West 2017) defines a dependent and neglected child as, *inter alia*, one who "is suffering from abuse . . . ." Because Mother's petition included allegations of dependency and neglect, she cannot now argue that the juvenile court lacked jurisdiction in this matter.

Furthermore, with regard to Mother's allegations concerning venue, it is undisputed that the Children and Mother were living in Fentress County with Father at the time of the filing of Mother's petition. As such, venue was proper in Fentress County based on Tennessee Code Annotated § 37-1-111 (providing that venue is generally proper in the county in which the child resides or, for dependency and neglect proceedings, in the county in which the child is present when the action is commenced). The fact that Mother had purportedly left Fentress County and found temporary housing at a safe shelter in Davidson County by the time of the hearing does not alter the fact that she and the Children were residing in Fentress County at the time her petition was filed, and no transfer was sought pursuant to Tennessee Code Annotated § 37-1-103(d)(3).

Mother further asserts that the juvenile court proceeded without probable cause in issuing its bench order removing the Children from her custody and failed to find that there was no less drastic alternative to removal. We disagree. The juvenile court's order specifically stated that proof presented during prior hearings concerning the order of protection, Josiah's statements, and Mother's letter expressing that she wanted to dismiss the order of protection all provided evidence that the Children were dependent and neglected. The juvenile court also found that because of the emergency nature of the Children's conditions, the lack of preventative measures was reasonable and that there was no less drastic alternative to removal. Mother's contentions concerning a lack of proper findings are unavailing.

Finally, Mother posits that the juvenile court erred by continuing the removal of the Children beyond a period of eighty-four hours, pursuant to Tennessee Code Annotated § 37-1-117(b)(1) (West 2017), which provides that a preliminary hearing shall be held no later than eighty-four hours after the child is removed. Mother failed to raise this argument during the *de novo* hearing before the trial court, however, and cannot do so for the first time on appeal. *See Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991) ("[I]ssues not raised in the trial court cannot be raised for the first time on appeal."). We therefore determine that Mother's sub-issue concerning the timing of the preliminary hearing has been waived.[4] For all of the foregoing reasons, we find Mother's issue concerning the juvenile court's removal order to be without merit.

---

[4] We note that the juvenile court's June 14, 2017 order specifically provided that further hearing would be held on July 10, 2017, "or within 72 hours of a request for a hearing by either parent." Mother has not argued that she requested a preliminary hearing within seventy-two hours. *See, e.g., In re Spencer P.*, No. M2009-00019-COA-R3-JV, 2010 WL 2160694, at *3 (Tenn. Ct. App. May 27, 2010) (explaining that the first phase of a dependency and neglect proceeding "involves a preliminary hearing, the function of which is to allow the juvenile court to decide whether, based on a finding of 'probable cause,' the child should

V. Dependency and Neglect Adjudication

Both parents assert that the trial court erred by determining that the Children were dependent and neglected while in the parents' care. Tennessee Code Annotated § 37-1-102(b)(13) defines a dependent and neglected child, in pertinent part, as one:

(C)    Who is under unlawful or improper care, supervision, custody or restraint by any person, corporation, agency, association, institution, society or other organization or who is unlawfully kept out of school;

(D)    Whose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child;

* * *

(F)    Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;

(G)    Who is suffering from abuse or neglect . . . .

Following a *de novo* trial, the trial court made the following findings related to its ultimate determination that the Children were dependent and neglected:

1.    The Court finds the testimony of the children, Josiah, Nehemiah, Jonathan, and Hadasah to be credible. Further, the Court finds the testimony of all non-party witnesses to be credible. The negative inference that can be drawn from pleading the 5th Amendment by both parents is given appropriate weight.

2.    Josiah, Nehemiah, and Jonathan were subjected to severe beatings by [Father]. [Mother] witnessed and at times participated in the beating of these children. The Father used a large wooden paddle described by one of the children as a two by four. Mother used a ruler or wooden spoon. Further, two (2) of these children were subjected to cruel and torturous behavior by being locked in closets, forced to wear wetsuits that were sewn so that they could not be removed, and being exposed to their parents' domestic violence

be removed from the parent's custody pending an adjudicatory hearing.").

issues. Mother smeared baby feces on Josiah and on Nehemiah as punishment. At times the children were made to hit each other.

3. The three (3) older boys hereinabove referenced sustained bruises to their bodies as a result of the beatings. Further, on at least one (1) occasion, Nehemiah had an open wound on his buttocks area as a result of the beating. On another occasion, [he] received an injury to his hand during a beating which caused extreme swelling.

4. The male school age children received marginal education through home schooling by their Mother and at Faith Christian School. The parties' daughter, Hadasah, endured extreme educational neglect in that she received very little education pursuant to a home school program administered by her Mother. Hadasah, at the age of a 6th grader, performed at a 2 percentile in math and a 4 percentile in reading. Therefore, 98% of 6th graders performed better than her in math and 96% of 6th graders performed better than her in reading. The school principal confirmed these facts.

5. The four (4) older children were forced to endure an impossible interrogation cycle by their parents. Some of the children were sexually abused by a sitter. That resulted in the parents forming a belief that the children were perpetrating [on] each other. The children were interrogated and questioned on a regular basis, up to six (6) times per week, about whether they had touched one of the other children in a sexual manner. If the children denied that action, they received a beating. If they admitted that action, they received a beating. Mother would require all the children to clap their hands for extended periods of time. If they were clapping they could not touch each other. The children were placed in an impossible situation which was detrimental to their mental and emotional well-being.

6. All of the [Children] endured exposure to domestic violence by their parents. According to the testimony of [four of the Children], their parents fought on a regular basis, their yelling and screaming often [went] into the wee hours of the morning, their arguing with each other occurred at places such as Walmart, the children were routinely late for school because their parents were arguing, the children had to endure their parents' accusations of looking at or receiving attention from other men/women. On at least one (1) occasion, Mother was physically assaulted by Father striking her on the foot.

7.  Mother filed a Petition for Order of Protection wherein she swore under oath that Father had physically and otherwise abused her and the children. She ultimately requested dismissal of that Petition at which time the children were bench[-]ordered into custody.

8.  It is recognized that a significant portion of the physical and emotional abuse occurred in the state of California. However, the children were also subjected to domestic violence between their parents, physical abuse, continuing educational neglect, and environmental neglect in Fentress County, Tennessee.

9.  The residence at Tinchtown Road in Fentress County, Tennessee was not properly maintained. The children testified to rats being in the residence. This was confirmed by Father. The children testified that, at times, when they would bounce on the furniture, rats would run out of the furniture and they would kill the rats. Further, the children testified that large amounts of trash accumulated in and about the residence particularly in a detached garage. A rat infestation problem resulted from the trash. Although the parents had operable motor vehicles, the trash was not regularly taken to the dump. Additionally, the mobile home in which the family last resided was a two (2) bedroom mobile home. Thus, the children could not avoid hearing the constant arguing of their parents.

10. As the emotional turmoil intensified, it appears that Mother reached a breaking point. The oldest child was living outside of the home and attending a public high school in Fentress County, Tennessee. Apparently, after leaving an ambulance, Mother walked in the cold rain to the school. She told her son that he had been a great son. She led him to believe she was going to harm herself. Someone at the school took Mother to the hospital. It is unclear whether she received treatment.

11. According to Jerri Cross, a Tennessee licensed professional counselor, Malachi and Hope were subjected to domestic violence by their parents. She stated this exposure is detrimental to their long term mental health.

12. Both Malachi and Hope have been diagnosed with having an Adjustment Disorder. Dr. Cross testified that Mother told her Malachi would freeze and shudder when his Father came into the room. She stated that Hope expressed suicidal ideations.

- 10 -

13. Nehemiah acknowledged that he had suicidal ideations.

Based upon these findings, the trial court determined that DCS had proven by clear and convincing evidence that the Children were dependent and neglected while in the care of the parents. Upon our thorough review of the record, we agree.

As this Court has explained:

[W]hether the ultimate issues of dependency and neglect or severe child abuse have been established by clear and convincing evidence are questions of law, which we review de novo with no presumption of correctness. This Court reviews the trial court's findings of fact de novo on the record accompanied by a presumption of correctness, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). If some of the trial court's factual findings are based on its determinations of the credibility of the witnesses, then this Court will afford great weight to those credibility determinations and will not reverse such determinations absent clear evidence to the contrary.

*In re Tamera W*., 515 S.W.3d 860, 870-71 (Tenn. Ct. App. 2016) (other internal citations omitted).

The proof in this matter demonstrated that the Children were clearly subjected to abuse and neglect through the conduct of the parents. Four of the children testified consistently and with great detail concerning the physical and verbal abuse that was inflicted upon them by both Father and Mother. Although considerable abuse occurred when the family previously resided in California, their testimony was clear that the abuse continued after the family moved to Tennessee. The trial court's findings concerning the abuse, as detailed above, are well supported by the evidence.

Josiah and Nehemiah both testified that Father's physical abuse of them persisted when the family lived in Fentress County. Johnathan and Hadasah confirmed this. All four testified that they were subjected to continuing verbal abuse as well. Furthermore, all four of the children who testified disclosed being subjected to domestic violence in Tennessee in the form of constant yelling and fighting by the parents, to the extent that the Children were unable to sleep at night. As described by Hadasah, the parents argued almost constantly and did little else. The four children who testified related that the older siblings assumed responsibility for the care of the younger siblings while the parents fought.

- 11 -

The testifying children also consistently described the unsanitary living conditions that the family endured in Tennessee, including rodent infestations and piles of garbage and unwashed laundry. Moreover, although the Children were allegedly being homeschooled, the testifying children stated that they did little schoolwork at home and were never tested. As a result, all of the Children were behind in their grade-level knowledge and skills when they enrolled in school, with Hadasah suffering the greatest educational neglect. Although the school-age boys were eventually enrolled in school, Hadasah and Hope were not. In fact, Hadasah stated that she spent a significant amount of her time helping Mother take care of the younger siblings, such that when she entered public school in sixth grade, she could barely read and write.

As a result of their living conditions with the parents, Josiah and Nehemiah each reported that he had contemplated suicide. Ms. Cross, the counselor working with Hope and Malachi, testified that both of those children expressed fear of being abused by their parents. She further reported that Hope had also presented suicidal thoughts. All four of the children who testified stated that they felt unsafe when living with the parents. The three testifying children who were still minors related that they did not wish to visit with their parents. In addition, Nehemiah explained that Nathaniel and Noah did not enjoy visiting with their parents and were stressed and traumatized by the visits. Ms. Cross reported that Hope and Malachi had expressed anger toward their parents for the abuse suffered by their older siblings.

Although the parents invoked their Fifth Amendment privilege against self-incrimination regarding most of the abuse allegations, Mother did admit that Father had been abusive toward her and the Children, both physically and verbally. Mother stated that her concerns over Father's behavior toward the Children prompted her relocation to Nashville. Mother also admitted that Hadasah's education had been neglected. Father admitted that he had spanked the Children "too hard" and that he had anger issues. Father further admitted that he had hit Mother's foot and grabbed her wrist. Father acknowledged that Mother and he frequently argued and yelled with the Children present.

Based upon our review of the proof presented at trial, we determine that the evidence supports the trial court's finding, by clear and convincing evidence, that the Children were dependent and neglected while in the care of the parents. Mother and Father argue, however, that the trial court should have looked at the circumstances that existed at the time of the Children's removal and/or the time of the *de novo* hearings in the trial court to determine whether the Children were dependent and neglected. *See Green v. Green*, No. M2007-01263-COA-R3-CV, 2009 WL 348289, at *10 (Tenn. Ct. App. Feb. 11, 2009) ("[I]in a de novo appeal, the circuit court does not review the juvenile court's decision or determine the validity of the juvenile court's action. Instead, the circuit court is to make its own decision based on the evidence presented to it."). Mother argues that because the Children were "safe" at the time of their removal, they should not have been adjudicated as dependent and neglected. Moreover, Mother and

Father argue that by the time of the dispositional hearings, their circumstances had changed in that both were working, each had a separate and suitable residence, and they had finalized their divorce. We determine the parents' arguments to be unavailing.

As to Mother's contention that the Children were no longer dependent and neglected at the time of their removal due to her move to Nashville, which she alleges had rendered the Children "safe," we note that at least two of the testifying children described living in unsuitable conditions in the domestic violence shelter, which Hadasah described as "dirty." Nehemiah stated that the family had an inadequate food supply while living in Nashville. Hadasah also reported that Mother was acting "crazy" and was somewhat unresponsive to their pleas.

By the time of the *de novo* trial, the Children were residing with relatives, and the testifying children described their lives as "normal" for the first time. As previously explained, however, the children still expressed fear of the parents and did not want to visit with them. Although the parents had improved their living conditions somewhat, neither parent apparently recognized the role he or she had played in the Children's trauma. Instead, as the trial court found, the parents attempted to deflect blame and mislead their counselors concerning the magnitude of the abuse. As such, we determine that the Children remained dependent and neglected by the time of trial in the trial court. *See Green*, 2009 WL 348289, at *10 (affirming the trial court's dismissal of the father's dependency and neglect petition because the mother was no longer living with a registered sex offender at the time of trial). We find the parents' contentions to the contrary to be without merit.

## VI. Severe Child Abuse

Mother also asserts that the trial court erred by determining that she had committed severe child abuse against the Children. The trial court specifically found that Josiah, Nehemiah, and Jonathan had been subjected to severe child abuse at the hands of their parents. The statutory definition of severe child abuse applicable to dependency and neglect proceedings is found in Tennessee Code Annotated § 37-1-102(b)(22) (West 2017), which provides in relevant part:

(22) "Severe child abuse" means:

    (A)    (i)    The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

- 13 -

> (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).
>
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct[.]

"Serious bodily injury" includes, but is not limited to, "second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." Tenn. Code Ann. § 39-15-402(d) (West 2017).

In this case, the evidence was clear that Mother had knowingly failed to protect the three eldest children from physical abuse occurring in California that was likely to cause serious bodily injury or death. As examples of the acts occurring in California, Josiah, Nehemiah, and Jonathan confirmed that Mother was aware of the beatings inflicted by Father with a large, wooden paddle or "two by four" but that Mother did nothing to intervene for their protection. They also testified that Mother was aware of the bruises and injuries inflicted upon them. Hadasah explained that she had once entered the room when Mother was inspecting an open wound on Nehemiah's buttocks caused by Father's hitting him. Furthermore, testimony demonstrated that Mother had participated in the acts of locking the eldest three boys in closets and "sewing" them into wetsuits at night without providing them with adequate ventilation or the ability to use the restroom.

After moving the family to Tennessee, Mother still failed to protect the Children from ongoing abuse by Father, which the three eldest children testified had persisted, albeit not as frequently. Mother acknowledged at trial that in her petition seeking an order of protection, she claimed that Father had been "smacking" the Children and had spanked them too hard. Mother testified that these allegations were true. In addition, Mother acknowledged two specific incidents of physical assault by Father about which Josiah and Nehemiah had previously testified. In one instance, Josiah reported that Father had assaulted him in the parking lot of a Wal-Mart and "slammed" him against the side of the family's van. Nehemiah described an instance when Father tackled him to the floor inside the Fentress County home, causing Nehemiah to hit his head. Moreover, Mother admitted that the Children had suffered in her home and that she understood why they were angry.

- 14 -

In addition to the above, Ms. Cross testified that Hope and Malachi had witnessed significant domestic violence in the home and that, over time, such environment could cause severe depression. Mother admitted her participation in the ongoing arguments and altercations with Father that occurred in the home. In addition, at least three of the Children had expressed having suicidal thoughts while in the care of the parents.

Based on our thorough review of the record, we determine that the evidence presented supports the trial court's finding, by clear and convincing evidence, that Mother committed severe child abuse against the Children. Mother participated in and failed to protect the Children from abuse that was likely to and did cause serious bodily injury and severe depression in the Children. We therefore affirm the trial court's finding that Mother had perpetrated severe child abuse while the Children were in her care.

## VII. Reunification

Finally, Mother argues that the trial court erred by failing to return custody of the Children to Mother or direct that reunification be sought by DCS. Based on the finding of severe child abuse perpetrated by Mother, we disagree.

Tennessee Code Annotated § 37-1-130(c) (West 2017) provides:

> No child who has been found to be a victim of severe child abuse shall be returned to the custody or residence of any person who engaged in or knowingly failed to protect the child from the brutality or abuse unless the court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse. The court shall file written findings of fact that are the basis of its conclusions on that issue within thirty (30) days of the close of the hearing or, if an appeal or petition for certiorari is filed, within five (5) days thereafter, excluding Sundays. No such child shall be returned to such custody on the basis of the court's order until five (5) days after entry of the order without the consent of the department and the petitioner.

Regarding this issue, the trial court found that neither parent had shown clear and convincing evidence that the Children would be "provided a safe home free from further brutality and abuse." Although the court commended Mother concerning improvements to her lifestyle and mental state, the court found her lack of disclosure with therapists and the evaluator regarding her participation in the abuse to be troubling. The court also noted that Mother continued to blame Father for her estrangement from the Children and had not acknowledged her own responsibility for the current situation. Following our thorough review of the evidence, we determine that the proof supports the trial court's findings and conclusions in this regard.

Based on the trial court's determination that the parents had subjected the eldest children to severe child abuse, "the trial court was authorized by section 37-1-166(g)(4)(A) to order a disposition of the child[ren] that did not include an effort toward reunification." *See In re Tamera W*., 515 S.W.3d at 876. We therefore determine Mother's final issue to be without merit.

## VIII. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in its entirety. Costs on appeal are assessed one-half to Mother, Amy H., and one-half to Father, Timothy H. We remand this matter to the trial court for further proceedings consistent with this opinion.

_____
THOMAS R. FRIERSON, II, JUDGE