IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 1, 2024

## IN RE JOSEPHINE H. ET AL.

**Appeal from the Circuit Court for Montgomery County**
**No. CC2021CV1439      Kathryn Wall Olita, Judge**

———————————————————

**No. M2023-01362-COA-R3-JV**

———————————————————

This is a dependency and neglect case. Appellants/parents do not dispute the trial court's finding that the children are dependent and neglected. Rather, the sole issue involves whether the trial court's disposition, under Tennessee Code Annotated section 37-1-130, was made in compliance with section 37-1-130(c) and, if so, whether the placement of the children with their aunt was "best suited to the protection and physical, mental and moral welfare of the child[ren]." Tenn. Code Ann. § 37-1-130(a). Affirmed and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ANDY D. BENNETT and KRISTI M. DAVIS, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellants, Richard H. and Tina H.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Mara M. Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services

**OPINION**

**I. Background**

Richard H. ("Father") and Tina H. ("Mother," and together with Father, "Parents," or "Appellants") are the natural parents of the two children at issue in this appeal, Josephine H. (d/o/b August 2016) and Justice H. (d/o/b August 2017) (together, the "Children"). Appellee Tennessee Department of Children's Services ("DCS") first became involved

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

with this family in 2018. On August 23, 2018, the Clarksville Police Department ("CPD") responded to a report of suspected child abuse in the Parents' home. Sergeant Lisa Fatula, with the CPD, discovered that the Children's five cousins, G.P., L.P., V.P., N.H., and P.P. (together, the "Cousins"), also lived in Parents' home. G.P., the alleged victim of the abuse, was five years old at the time. G.P. was found to have swelling, bruising, and redness on the right side of his face and throat. In interviews with the CPD, G.P., L.P., and P.P. revealed that Father hit G.P. in the face and strangled him. At the time of the altercation, Parents, paternal grandmother (Josephine W.), Cousins, and the Children were at the home. When asked who hurt his head, G.P. identified "Uncle Richard," *i.e.*, Father, and re-enacted someone punching the side of his face and choking him. G.P. stated that "Uncle Richard" got mad because G.P. was not doing his "letters." P.P. stated that, while Father was with G.P. in the playroom, P.P. heard yelling, a loud noise, and G.P. screaming. P.P. disclosed that, after he heard these noises, G.P. had a big, swollen bruise on his face. Although P.P. stated that he tried to tell a grownup about G.P.'s injuries, he could not find an adult before leaving for the school bus. P.P. further stated that, after G.P. started school, "Uncle Richard" would hit G.P. because he would get mad when G.P. messed up on schoolwork. P.P. stated that G.P. did not want to come home from school some days because he feared Uncle Richard. P.P. disclosed that Uncle Richard "hurts" him sometimes but not like he hurts G.P.

During the investigation, Sergeant Fatula also spoke with the Parents. When informed that Mother, paternal grandmother, and P.P. had reported his actions, Father responded, "[T]hey're not wrong." Nonetheless, throughout these proceedings, Father has continued to deny the allegations of abuse. Mother stated that Father had been working with G.P. on his letters in the playroom and that she went to bed. Mother asserted that, due to hearing loss, she did not hear the events giving rise to the investigation. Mother further stated that she did not turn the lights on in the morning to avoid waking the younger children, so she did not see G.P.'s face before he left for school. The Parents initially refused DCS's request to bring the Children and Cousins in so that DCS could assess their wellbeing. In fact, Father took the Children and refused to disclose his whereabouts.

Based on the foregoing events, on August 27, 2018, DCS filed the dependency-and-neglect petition in the Montgomery County Juvenile Court ("Juvenile Court").[2] DCS asked the Juvenile Court to declare the Children dependent and neglected. DCS further averred that Justice was the victim of severe child abuse and later amended its petition to include findings made during the Children's medical evaluations, *see infra*. Because Father had taken the Children and his whereabouts were unknown, DCS asked for an attachment *pro corpus*, requiring the Parents to bring the Children to DCS. On August 27, 2018, the Juvenile Court entered the attachment, which ordered the Parents to bring the Children to DCS pending a hearing on the matter. The Parents brought the Children to DCS on August

---

[2] DCS filed a separate petition regarding the Cousins. The Cousins are not the subjects of the instant appeal.

30, 2018. On August 31, 2018, the Juvenile Court entered a protective-custody order removing the Children to DCS custody. Following an Interstate-Compact-on-the-Placement-of-Children investigation, in October 2018, the Children were placed with their maternal aunt, Bette R., who resides in Florida. The Children have remained in Bette R.'s custody since that time.

On August 27, 2018, Danielle Knox, CPNP-AC, a member of the Vanderbilt CARE Team examined the Cousins. In her deposition, which was admitted as Trial Exhibit 9, Nurse Knox opined that, to a reasonable degree of medical certainty, G.P. had been the victim of physical abuse. Nurse Knox explained that G.P. had bruising and swelling on the right side of his forehead and temple, healing abrasions on his neck, what appeared to be old scars on his neck, and scattered lesions and abrasions on his hips. Photos, admitted as Trial Exhibit 2, corroborate Nurse Knox's assessment of G.P.'s injuries. Nurse Knox testified that G.P. clearly identified Father as the perpetrator of his injuries.

On September 5, 2018, Nurse Knox evaluated the Children and determined that Justice, who was just one-year old, had spinal-compression fractures that were consistent with nonaccidental trauma and were "highly concerning for child physical abuse." As Nurse Knox noted, these fractures would occur "outside of the normal force of normal play" and are common in abused children who are "victims of abusive head trauma" such as "being slammed down on their head or buttocks." Nurse Knox explained that, although such injury could have resulted from a traumatic accident, an attentive caregiver would know something was wrong, and there would be documentation of such an accident—none of which was present in Justice's case.

Based on the results of CPD and DCS investigations, and the medical evaluations discussed above, Mother and Father were both charged with seven counts of criminal child abuse. Father was charged with aggravated child abuse of G.P., but he pleaded guilty to the amended charge of child abuse. Father pleaded guilty to child abuse of L.P., V.P., and N.H., and he pleaded no contest to child abuse of Justice. On July 20, 2020, Father was sentenced to ten years of supervised probation. Mother was charged with child neglect of G.P., L.P., V.P., N.H., and Justice for failure to protect, and she pleaded no contest to the charges. On October 6, 2020, Mother was sentenced to three years supervised probation.

On October 7, 2020, Parent's waived an adjudicatory hearing in the Juvenile Court and stipulated that the Children were dependent and neglected and that Justice was the victim of severe child abuse. Parents were represented by counsel at all relevant times. Based on the Parents' stipulations, on October 7, 2020, the Juvenile Court entered an order adjudicating the Children to be dependent and neglected. Parents did not appeal this order. However, on March 22, 2021, Parents filed a motion to set aside the Juvenile Court's order because of alleged defects in the appeal notice. The Juvenile Court entered an amended adjudicatory order on July 16, 2021, to include notice that the order was appealable, and the Parents appealed the amended order to the Montgomery County Circuit Court ("trial

court”).

Following a hearing on April 19, 2023, the trial court entered its Memorandum Opinion and Order on May 15, 2023, wherein it held, in relevant part:

The Court finds that the facts set forth above clearly and convincingly support the conclusion that Justice [H.] is the victim of severe child abuse and that [Parents] engaged in severe child abuse as defined by statute. Further, the Court finds that Josephine and Justice [] are dependent and neglected children. The Court finds that Bette [R.] is an appropriate custodian of the [C]hildren and that they are bonded to her. It is in the [C]hildren’s best interest if they remain in the care and custody of Bette [R.].

Parents filed a Tennessee Rule of Civil Procedure 59.04 motion to alter or amend the order. The trial court denied the motion by order of August 23, 2023. Parents appeal.

## II. Issue

Appellants raise one issue for review as stated in their brief:

The Trial Court erred, as a matter of law, in not addressing the best interest analysis for the determination of whether or not [the Children] should be returned to the custody of Appellants.

Importantly, Parents do not raise an issue challenging either the trial court’s adjudication of dependency and neglect, severe child abuse, or its denial of their Tennessee Rule of Civil Procedure 59.04 motion. As such, we will neither address nor disturb these aspects of the trial court’s rulings. *See, e.g., In re Ryat M.*, No. M2020-00156-COA-R3-JV, 2021 WL 4432729, at *6 (Tenn. Ct. App. Sept. 27, 2021) (“Any issue not included in the statement of issues presented for review as required by Tennessee Rule of Appellate Procedure 27(a)(4), is not properly before the Court of Appeals.”).

## III. Standard of Review

This case was tried without a jury. As such, “[o]ur review is de novo upon the record of the proceedings below with a presumption of correctness as to the trial court’s factual findings unless the evidence preponderates against those findings.” *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006) (citing Tenn. R. App. P. 13(d)). However, the trial court’s conclusions of law “are accorded no such presumption.” *Id*. (citing *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993)).

We also note that this Court is “required to defer to the trial court’s credibility findings . . . .” *Williams v. City of Burns*, 465 S.W.3d 96, 120 (Tenn. 2015); *see also Street*

- 4 -

***v. Street***, No. E2016-00531-COA-R3-CV, 2017 WL 1177034, at \*7 (Tenn. Ct. App. Mar. 29, 2017). In ***Wells v. Tennessee Bd. of Regents***, 9 S.W.3d 779 (Tenn. 1999), the Tennessee Supreme Court explained that

> trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See* ***State v. Pruett***, 788 S.W.2d 559, 561 (Tenn. 1990); ***Bowman v. Bowman***, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See* ***Tenn-Tex Properties v. Brownell-Electro, Inc.***, 778 S.W.2d 423, 425-26 (Tenn. 1989); ***Mitchell v. Archibald***, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See* ***Humphrey v. David Witherspoon, Inc.***, 734 S.W.2d 315, 315-16 (Tenn. 1987); ***Bingham v. Dyersburg Fabrics Co., Inc.***, 567 S.W.2d 169, 170 (Tenn. 1978).

***Wells***, 9 S.W.3d at 783.

To the extent the issue requires us to interpret the statute(s) governing dependency-and-neglect actions, we note that statutory interpretation is a question of law, which we review de novo with no presumption of correctness. *See* ***In re Estate of Tanner***, 295 S.W.3d 610, 613 (Tenn. 2009). The Tennessee Supreme Court has summarized the principles involved in statutory construction as follows:

> When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. ***Houghton v. Aramark Educ. Res., Inc.***, 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. ***In re C.K.G.***, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. ***Eastman Chem. Co. v. Johnson***, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. ***Abels ex rel. Hunt v. Genie Indus., Inc.***, 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. ***Parks v. Tenn. Mun. League Risk Mgmt. Pool***, 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." ***Marsh v. Henderson***, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of

the act repugnant to another" should be avoided. ***Tenn. Elec. Power Co. v. City of Chattanooga***, 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed. ***Owens v. State***, 908 S.W.2d 923, 926 (Tenn. 1995).

*Id*. at 613-14.

### IV. Analysis

Dependency and neglect proceedings have two phases— "an initial hearing on the dependency and neglect petition and, if a child is found to be dependent and neglected, the court must proceed with a disposition of the case." ***In re Hannah S.***, 324 S.W.3d 520, 525 (Tenn. Ct. App. 2010). In this case, Appellants' issue involves the second phase, *i.e.,* disposition or placement of the Children. Tennessee Code Annotated section 37-1-130 governs dispositions in dependency-and-neglect cases. The version of the controlling statute in effect at the time DCS filed its petition is applicable here. In relevant part, the statute provides that:

> (a) If the child is found to be dependent or neglected, the court may make any of the following orders of disposition best suited to the protection and physical, mental and moral welfare of the child:

> (1) . . . permit the child to remain with the child's parents, guardian or other custodian . . .;
> (2) . . .transfer temporary legal custody to or grant permanent guardianship . . . to any of the following:

> \*\*\*

> (D) An individual in another state with or without supervision by an appropriate officer under § 37-1-142;

Tenn. Code Ann. §§ 37-1-130(a)(1), 37-1-130(a)(2)(D); ***In re Tamera W.***, 515 S.W.3d 860, 876 (Tenn. Ct. App. 2016) (citing Tenn. Code Ann. § 37-1-130(a)) ("Among the available dispositions are allowing the child to remain in the home, granting temporary legal custody to a third party, granting a permanent guardianship to a third party, or placing the child in the custody of DCS."). However, the statute goes on to state that

> [n]o child who has been found to be a victim of severe child abuse shall be returned to the custody or residence of any person who engaged in or knowingly failed to protect the child from the brutality or abuse **unless the**

**court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse. The court shall file written findings of fact that are the basis of its conclusions on that issue** . . . .

Tenn. Code Ann. § 37-1-130© (emphasis added). In the first instance, section 37-1-130© applies only to Justice, who is the "victim of severe abuse." *See **In re Samuel D.**,* 536 S.W.3d 447, 457 (Tenn. Ct. App. 2016) (finding that Tennessee Code Annotated section 37-1-130© does not apply to children who are not the direct victim of abuse). We will address Josephine's placement below. Concerning section 37-1-130©, Appellants would have us read the emphasized language, *supra*, to require a trial court to make written findings and conclusions that placement with the Parents is not in Justice's best interest. Specifically, Appellants contend that the trial court erred "in not addressing the best interest analysis for the determination of whether [Justice] should be returned to the custody of Appellants." However, this is not the mandate of the statute.

The plain language of the statute can be parsed as follows. The statute begins with the proposition that placing the abused child with the perpetrator of the abuse is not a good placement option. As such, if a trial court opts to place the child with the perpetrator, the statute requires the court to make written findings that the evidence clearly and convincingly shows that the perpetrator's home is safe. Application of this requirement safeguards the ultimate goal of the statute, which is to ensure that a dependent-and-neglected child's placement is "best suited to the protection and physical, mental and moral welfare of the child." Tenn. Code Ann. § 37-1-130(a). Unlike other statutes addressing custodial decisions, the dependency-and-neglect statutes do not mention a best-interest analysis per se. *See e.g.*, Tenn. Code Ann. § 36-6-106 (requiring a best-interest analysis in cases involving parental-custody arrangements); Tenn. Code Ann. § 36-1-113(i) (requiring a best-interest analysis in termination of parental rights proceedings); Tenn. Code Ann. § 37-1-802 (requiring a best-interest analysis in cases involving permanent guardianship). Rather, the dependency-and-neglect disposition statute requires a placement that is "best suited to . . . [the] welfare of the child." Tenn. Code Ann. § 37-1-130(a). Although a placement that is best suited to the child's welfare would certainly be in his or her best interest, the statute does not require a trial court to conduct a full best-interest analysis as required under the other custodial statutes mentioned above. Contrary to Appellants' position, where (as here) the trial court opts to place the child outside the perpetrator's home, the court does not have to justify that decision on any ground other than such placement is "best suited to the protection and physical, mental and moral welfare of the child." Tenn. Code Ann. § 37-1-130(a). In short, Tennessee Code Annotated section 37-1-130(c) is not applicable here because the trial court did not decide to place Justice in the home of his abusers, and the "written findings" requirement of Tennessee Code Annotated section 37-1-130(c) is only triggered when a trial court determines to place the abused child in the home with the perpetrator. In that case, the trial court may not proceed with such disposition **unless** it first makes written findings that such disposition will be provided the

child with "a safe home free from further such brutality and abuse." Tenn. Code Ann. § 37-1-130(c) (emphasis added).

Here, the trial court held that "the [C]hildren should not be returned to [Parents]. Bette R[.] is an appropriate placement for the [C]hildren and they are bonded to her after having been with her for so many years. The Court finds is appropriate that they remain in her care and custody." The question, then, is whether placement with Bette R. is "best suited to the protection and physical, mental and moral welfare of the [C]hild[ren]." Tenn. Code Ann. § 37-1-130(a). This question applies to the placement of both Justice and Josephine.

Before turning to the evidence, we note that the trial court made specific findings concerning the testimony of certain witnesses. Specifically, the trial court's order states that it "does not find [Mother's] testimony to be credible." The order further states that "[t]he Court does not find [Father's] testimony to be credible." Likewise, the trial court found Josephine W.'s "testimony [not] to be entirely credible." In reviewing the evidence, we will not re-evaluate the trial court's assessment of witness credibility because there is not clear and convincing evidence to the contrary. *Wells*, 9 S.W.3d at 783 (citations omitted).

We further reiterate that we are not reviewing the trial court's findings that the Children are dependent and neglected or that Justice is the victim of severe child abuse. Rather, our review is limited to whether the preponderance of the evidence supports the trial court's placement of the Children with Bette R., *i.e.*, whether this placement is "best suited to the protection and physical, mental and moral welfare of the [C]hild[ren]." On review, we conclude that it does.

The Children have been in Bette R.'s custody since October of 2018. Josephine was two years old when she came to live with Bette R., and Justice was one year old. At the time of the hearing, Josephine was six years old, and Justice was five. Bette R. testified that Justice "has been diagnosed with ADHD; ODD; sensitivity to light, sounds, just certain things; and he has tested positive for being on the spectrum for autism." Bette R. stated that the Children do well in school, but Justice initially "had issues with new people and new surroundings." Both Children are receiving behavioral therapy.

Although Bette R. facilitates weekly FaceTime visits between the Children and Parents, she noted that "[s]ometimes [the Children will] be on [the call] for a lengthy period of time. Sometimes they don't want to talk at all so they'll just, Okay. Hi, bye, and they'll get off." Bette R. explained that, since the Children have lived with her, there have only been three in-person visits between the Children and Parents. At times, the Children refer to Parents as "mom" and "dad," but they also sometimes call Bette R. and her husband "mom" and "dad."

At the hearing, Mother and Father continued to deny that any abuse happened. Parents stated that G.P. received his injuries from falling from a bunk bed. Mother maintained that she did not see or hear anything concerning G.P.'s injuries. Concerning Justice's spinal injuries, Mother claimed that he was injured falling down the stairs. During her testimony, Mother admitted that after Justice allegedly fell down the stairs, he cried for a bit but was fine after Mother picked him up. As noted above, the trial court found Mother's testimony not to be credible.

In his testimony, Father attempted to provide numerous explanations for Justice's injuries. Like Mother, Father claimed that Justice's injuries were the result of fall down the stairs. Alternatively, Father opined that Justice may have been injured during the birthing process. However, when asked about any records to prove this theory, Father claimed he had no records because DCS took all the birth records to give to Bette R. on removal. There is no proof to substantiate this assertion. Although Father claimed that he attempted to contact approximately 15 doctors to review the records to prove how Justice's injury happened, not one doctor would review the case. When questioned further, Father could not provide the names of any of the doctors he allegedly contacted. As was the case with Mother's testimony, the trial court found that Father's testimony was not credible.

Concerning Parents' living arrangements, at the time the Children were removed from their custody, Parents resided with Father's mother, Josephine W. In addition to the abuse perpetrated against Justice and G.P., the record indicates that there was drug use in the home. Josephine W. testified that Father had marijuana brownies in the home, and Josephine W. "unintentionally ingested" them. After the Children were removed, Parents moved to Kentucky, where they lived at the time of the hearing. Parents have four other children, who reside with them in Kentucky. Parents did not inform DCS of their move, and, in fact, have been less than forthcoming with DCS during the entire custodial episode. The Children have never visited the Parents' home, and there has been no home study.

Given their ages (one and two years old) at the time they came to live with Bette R., and in view of the lack of physical contact between Parents and the Children, it appears that there is no true bond between the Parents and the Children. In fact, the record shows that Parents have not engaged in meaningful communication with Bette R. concerning the Children's daily lives, academics, or medical issues. However, it is clear that the Children have bonded with Bette R., her husband, two children, and their maternal grandmother, who also resides in Bette R.'s home. In their current home, the Children are doing well. At the time of trial, Justice was five and Josephine was six. The Children receive therapy, and Bette R. and her husband work with Justice to ensure that he will be able to fully participate in academics and extracurricular activities despite his diagnoses. The Children appear to be fully integrated into Bette R.'s home, which (given their young ages at the time of removal) is probably the only home they remember. By all accounts, the Children are thriving in their current placement, and there is ample evidence that placement with Bette R. is "best suited to the[ir] protection and physical, mental and moral welfare." Tenn.

Code Ann.§ 37-1-130(a).

## V. Conclusion

For the foregoing reasons, we affirm the trial court's order. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellants, Richard H. and Tina H. Execution for costs may issue if necessary.


<u>    s/ Kenny Armstrong          </u>
KENNY ARMSTRONG, JUDGE